STATE of Minnesota, Respondent,

v.

John Lawrence DANIELS, Appellant.

No. C5–80–051915.

Supreme Court of Minnesota.

April 8, 1983.

Mark S. Wernick, Minneapolis, for appellant.

Hubert H. Humphrey III, Atty. Gen., St. Paul, Thomas L. Johnson, County Atty., Vernon E. Bergstrom, Chief, Appellate Section, Rick Osborne, Michael Richardson, Asst. County Attys., and Beverly J. Wolfe, Law Clerk, Minneapolis, for respondent.

YETKA, Justice.

Appellant John Lawrence Daniels was found guilty of first-degree murder and attempted first-degree murder by a Hennepin County District Court jury on June 26, 1980. He was sentenced to a life sentence on the first-degree murder conviction and to 43 months on the attempt conviction, to run concurrently.

Daniels appeals from both convictions, alleging that errors committed at trial and the insufficiency of the evidence require a new trial. We affirm.

Daniels was convicted of murdering Alonzo Bridges and attempting to murder Michael Palmer during the early morning hours of July 10, 1979. Daniels came to Minneapolis from Kansas City, Missouri, in the spring of 1979 with his girl friend, L'Tanya Ragland. Ragland stayed in Minneapolis and worked as a prostitute while Daniels made frequent trips back and forth to Kansas City.

Michael Palmer is a self-described street hustler. He came to Minneapolis from Memphis, Tennessee, in May 1979. Two weeks after Palmer came to Minneapolis, an old friend of his, Kenneth Braswell, also came to Minneapolis. Although both men denied being pimps, Minneapolis police suspected them of earning money from prostitutes. The two men spent the 2–3 weeks prior to the shooting driving around in Braswell's black Lincoln automobile, hustling and talking to prostitutes.

Sometime during late June or early July 1979, Palmer approached Ragland on Hennepin Avenue in downtown Minneapolis. Ragland testified that Palmer had previously approached her and other women on the street, asking them to work as prostitutes for him. She denied ever telling Daniels of this. Daniels testified that Ragland had told him that a man was "aggravating" her by following her up and down the street. On July 5, Daniels saw Palmer approach Ragland and told him to leave his woman alone.

Palmer and Daniels met a second time on July 7. Palmer was a passenger in Braswell's Lincoln automobile as they drove around downtown Minneapolis. They stopped and Palmer approached an unidentified woman on the sidewalk. Daniels observed Palmer approach the woman and attacked him with a large stick. Palmer jumped into Braswell's car, Daniels got in his own green Cadillac, and both cars drove off. Daniels was then pulled over by police for driving in an erratic manner. Because Daniels was an out-of-state driver, he was arrested and jailed.

Daniels was released from jail the afternoon of July 9. He drove to Ragland's apartment and stayed there until evening. When Daniels went out that evening, he armed himself with a .22 caliber pistol. This gun was not the one involved in the shooting of Bridges and Palmer later that night.

That same evening, Braswell picked Palmer up in his black Lincoln. With Palmer in the front passenger seat, they

began to drive towards a North Minneapolis location to pick up a bag of marijuana. On the way to North Minneapolis, Braswell drove through downtown Minneapolis. Just prior to this, Daniels was standing by a nearby bar talking about Palmer with a man he called Hollywood. Another man, Robyn Amos, joined them, and they got into Amos' car, with Daniels driving, and drove to Daniels' car, which was parked near the Greyhound bus depot. Daniels testified that when they reached his car, but before he got out, they saw Braswell's Lincoln drive by and started following it in Amos' car.

Braswell and Palmer testified that, as they drove past First Avenue and Seventh Street, they saw Daniels' green Cadillac parked next to a blue Cadillac with three or four men standing around them. The trunk of Daniels' car was open. Braswell continued to drive towards their northside destination. At the intersection of Dupont and 14th Avenue, Braswell stopped and the blue Cadillac he saw by the bus depot pulled up next to him.

Daniels testified that when the car he was driving stopped next to Braswell's at 14th and Dupont, he got out and told the other driver that he wanted to talk with him. Braswell then drove off, Daniels got into the front passenger seat of the Cadillac, and Amos, who had moved to the driver's seat, began chasing the Lincoln.

Braswell testified that, when the Cadillac pulled up next to him, two or three men got out and Daniels, who was in the back seat, said he wanted Palmer. Palmer told Braswell to drive off because one of the men in the Cadillac had a gun. Braswell heard two or three gunshots as he drove off.

Palmer testified that, when the Cadillac pulled up beside them, he saw the driver's door open. The driver, Daniels, spoke to Palmer, referring to their prior night's confrontation. Palmer then saw a gun in Daniels' hand and told Braswell to drive off. As Braswell did so, two gunshots hit his car.

A high-speed car chase ensued, ending up at the intersection of Glenwood and Lyndale Avenues. During the chase, the rear window of Braswell's Lincoln was shot out. Driving south on Lyndale, Braswell collided with a car proceeding west on Glenwood. Braswell told Palmer to run, which he did. Braswell then saw two men pursue Palmer, one of whom Braswell identified as the man who had attacked Palmer with a stick two nights previously. After hearing several shots, Braswell saw two men get back in the blue Cadillac and drive off.

Palmer testified that, after the collision at Glenwood, he began running down the street towards a car parked about a block away. When he reached the car, he jumped into it through the driver's open window and was hit in the back with a bullet. Palmer then sat up and turned around to face the driver's window. Palmer testified that Daniels fired two more shots at him, hitting him in the chest and stomach.

Daniels does not dispute that he was by the car when the first shot was fired. He testified that after the accident at Lyndale and Glenwood, he saw Palmer jump out of the car. Daniels then ran after him. Hollywood, one of the other men Daniels claims was in Amos' car, was right behind Daniels, also chasing Palmer. They ran up to the car. After Palmer jumped into the car, Daniels looked in. He then heard a gunshot, looked at Palmer and the driver of the car, Alonzo Bridges, and told Hollywood that Hollywood had shot the wrong person. Daniels then ran off into the darkness and heard more gunshots. Daniels claims that, instead of returning to the Cadillac, he went downtown and took a cab to Ragland's apartment.

The driver of the car Palmer jumped into, Alonzo Bridges, died as a result of being hit in the neck by a .45 caliber bullet. Two women were in the car when Palmer jumped in. Donna Barrow was sitting in the back seat. She testified she saw three men run up to the car. One jumped in and two remained outside. She did not see a gun, but heard several shots and jumped out of the car. She could not identify any of the men she saw. She did testify that one of the men she saw outside the car was a light-skinned black man with a medium

Afro and a flowered shirt and that the man who jumped through the open window wore a black tee shirt. The other woman, Georgia Hardin, was sitting in the right front seat. She testified that Bridges slowed the car when they heard the loud sound of cars crashing behind them. They all turned around to see what had happened. She saw two men jump out of a car and start running towards them. Palmer was wearing a white tee shirt and his pursuer wore a printed shirt with a blue or black background. Hardin identified Daniels as the man with the flowered shirt. Hardin watched the two men until Palmer jumped in through the window. She then heard a gunshot and immediately got out of the car. She testified to hearing only one shot. Bridges then got out of the car from the driver's side and collapsed. Palmer drove away in the car.

William Shish was an off-duty Minneapolis policeman the night of the shooting. As he was driving down Lyndale Avenue in his pick-up truck the evening of July 9–10, two cars passed him going very fast, apparently in a chase. Shish followed them. As he approached Glenwood and Lyndale, he heard four shots and saw what appeared to be a car accident involving the cars he was following. Shish followed one of the cars to Royalston Avenue where it crashed into a building. During this time, he heard two more shots.

After the Cadillac crashed into the building, Shish slowed down as he approached to within one-half of a block of the scene. He saw one man exit out the right rear passenger door, described as "kind of tall," with "dark pants and kind of a printed shirt." Shish then pulled up behind the car and saw the driver fumble around, climb over the seat, and exit the car through the same door as the first man. Shish stayed at the scene until police arrived. He observed a spent .45 caliber shell on the ground outside the right rear passenger door. Photos of the car taken by police when they arrived

depict the car as Shish observed it, with one passenger side door open. Shish identified the driver of the car who was wearing gray pants and a gray vest from police photographs as Robyn Amos.

Gary Follet, the driver of the car that Braswell's Lincoln crashed into at Glenwood and Lyndale, and Steven Robinson, a passing motorist, also testified to events surrounding the shooting. Neither made a positive identification of any participant.

Officer Donald Brown and his partner, Officer Searles, arrived at Fifth and Royalston shortly after the accident. Brown investigated the scene and testified that two doors on the Cadillac were open on the passengers' sides. He also found a spent .45 caliber cartridge on the ground by the rear passenger door and Daniels' keyring in the back seat. Officer Hessing arrived later and took pictures of the scene at Lyndale and Glenwood and at Fifth and Royalston. Only one door of the car at Fifth and Royalston was open when Hessing took his pictures.

Police recovered several .45 caliber bullets and spent cartridges at Lyndale-Glenwood and Fifth and Royalston. All were fired from the same gun and matched the bullets recovered from the bodies of the two victims.

The day after the shooting, Daniels left Minneapolis and worked in Iowa under an assumed name for several months until he was arrested. Daniels and Ragland were married prior to trial.[1] During the police investigation, police recovered a bag of .45 caliber bullets from L'Tanya Ragland's apartment while searching the apartment pursuant to a search warrant in an unrelated robbery investigation. The bullets were found in Ragland's bedroom closet. Ragland testified that the bullets belonged to two men who stayed at the apartment and who were the robbery suspects sought by the police. Ragland also testified as to Daniels' whereabouts and actions after the shooting and before his arrest, as well as

---

1. Ragland's name at trial was L'Tanya Daniels. She is referred to in this opinion as L'Tanya

Ragland to avoid confusion.

Palmer's pre-shooting conduct on the streets of Minneapolis. On cross-examination, the prosecutor began to impeach her testimony by using a police statement given to an Iowa police officer subsequent to the shooting. The statement concerned Daniels' and Ragland's activities in Iowa and was never disclosed to the defense. The defense objected to its use after several questions had been asked. The objection was sustained, but no evidence was stricken, no sanctions were taken against the prosecutor, and no curative instruction was given.

The issues raised in this appeal are:

1. Was it reversible error for the trial court to deny the jury's request to review testimony of two police officers after having begun their deliberations?

2. Was it reversible error for the trial court to deny a motion for a mistrial where the prosecutor failed to disclose a police report to the defense and used the report to impeach a defense witness?

3. Was the prosecutor's final argument so improper that a new trial is required?

4. Is the evidence sufficient to sustain the jury's verdict convicting defendant of first-degree murder and attempted first-degree murder?

1. After deliberating for a period of time, the jury, by written notes, requested that it be allowed to review certain testimony. The notes were very specific. They requested the testimony of Officers Shish and Hessing regarding the accident at Fifth and Royalston. The notes addressed the issue of how many doors of the blue Cadillac were open when the police officers first observed the vehicle.

The jury's request was denied. The judge reasoned that to read the requested portions of the two police officers' testimony would give undue prominence to that portion of the evidence. The prosecutor argued that three or four other witnesses had testified regarding Fifth and Royalston. The testimony was widely scattered throughout the transcript between direct and cross-examination. To locate all references would be burdensome and impractical. The defense asked that the jury's request be honored as submitted, thus avoiding the burdensome task of producing all the other relevant testimony.

The judge recognized the practical difficulty of locating all relevant portions of the transcript. To avoid giving undue prominence to the testimony requested, and in light of the difficulty of providing all relevant testimony, the jury's request was rejected.

Appellant argues that the failure to grant the jury's request constitutes reversible error because the judge had no discretion under the rules to deny a reasonable request. The request is characterized as reasonable because the volume of evidence involved was small and critical to the identification issue. The state argues that the court has broad discretion in ruling on jury requests and that the court did not abuse its discretion here because undue prominence would have resulted if only the requested testimony were read, the total relevant record encompasses far too many pages to reread to the jury, and the entire incident at Fifth and Royalston is only a small part of the identification issue.

Jury requests for review of testimony after retiring for deliberation are governed by Minn.R.Crim.P. 26.03, subd. 19(2):

1. If the jury, after retiring for deliberation, requests a review of certain testimony or other evidence, the jurors shall be conducted to the courtroom. The court, after notice to the prosecutor and defense counsel, may have the requested parts of the testimony read to the jury and permit the jury to re-examine the requested materials admitted into evidence.

2. The court need not submit evidence to the jury for review beyond that specifically requested by the jury, but in its discretion the court may also have the jury review other evidence relating to the same factual issue so as not to give undue prominence to the evidence requested.

This rule replaced Minn.Stat. § 631.11 (1971) and changed the procedure from one requiring that the testimony be read to one granting discretion. The rule also differs from that contained in ABA Standards for Criminal Justice § 15–4.2 (1980). The ABA rule requires that any reasonable request be granted. Comments to the Minnesota rules state that the current rule "comes from" the ABA rule and takes the place of the similar provision in Minn.Stat. § 631.11 (1971).

Appellant argues that the ABA reasonableness standard should be incorporated into the Minnesota rule, thus severely limiting the scope of the trial court's discretion. This argument ignores the clear words of the current rule. The rule grants discretion to approve or deny the jury's request and does not explicitly incorporate the ABA reasonableness standard. Although the reasonableness of the jury's request is clearly an important factor in the court's decision, the Minnesota rule contemplates greater discretion than does the prior statute or the ABA rule.

This court has made it clear that, when the jury requests review of numerous pages of transcript, the trial court may deny the request. *See State v. Schluter,* 281 N.W.2d 174 (Minn.1979) (three witnesses—240 of 800 pages of transcript); *State v. Scott,* 277 N.W.2d 659 (Minn.1979) (one witness—115 pages of transcript—nearly half of total trial testimony).

In *State v. Spaulding,* 296 N.W.2d 870 (Minn.1980), this court stated, "[w]hether or not to grant a jury's request for a reading of trial testimony is within the discretion of the trial court." *Id.* at 878. There, the trial court had said at the outset of deliberations that no testimony would be read to the jury, thereby totally failing to exercise its discretion. This constituted reversible error when coupled with the prejudicial effect of the ruling.

█ In the present case, the court clearly acted within its discretion in denying the jury's request. Five witnesses testified to the accident scene at Fifth and Royalston. Three of these stated how many doors were open. It is difficult to determine the exact number of pages that would have been read if the attempt had been made to include all relevant testimony. The court would have had to make judgments as to what to include and what to exclude, both as to the testimony requested by the jury and as to additional testimony included in an effort to avoid giving undue prominence to the precise testimony requested. Thus, the court could have ended up reading anywhere from the few pages advocated by appellant to the 300 envisioned by the state.

Appellant also argues that prejudice resulted from the court's denial. Appellant puts great importance on how many doors of the Cadillac were open and, thus, how many people fled from the car after the accident at Fifth and Royalston. This issue is admittedly crucial to the defense. It is difficult to see, however, what prejudice resulted from the court's ruling. Five witnesses testified as to the scene at Fifth and Royalston. Three of these testified to the number of open doors-two said one was open, one said two were open. The jury had pictures of the accident scene showing only one door of the car open. In addition, numerous witnesses offered testimony going to how many men were in the Cadillac at the time of the chase, the shooting, and the flight afterwards. The judge wisely weighed the effect of highlighting a very small portion of the evidence on this issue and, in his discretion, chose to not read any of the testimony.

The court did not commit error by denying the jury's request to rehear certain testimony and no significant prejudice resulted.

2. Late in the trial, the defense called L'Tanya Ragland as a witness. She testified to, among other things, events occurring after the shooting, including her going to live with appellant in Iowa a month after the shooting.

On cross-examination, the state began to question Ragland about her and appellant's activities in Iowa and appellant's belief as to being wanted by police in Minneapolis.

The state attempted to impeach her testimony by using a statement she had given to a police officer in Iowa. After several questions using this document as prior inconsistent statements, the defense realized that it had never been supplied with a copy of the police statement. An objection was made at this point. The court sustained the objection, stating that the report should have been disclosed. No further questions from it were allowed. The court, however, did not strike any of the testimony given prior to the objection, gave no curative instruction to the jury, and denied defendant's motion for a mistrial.

Appellant argues that it was reversible error for the court to deny the motion for mistrial, claiming that the prosecutor had deliberately withheld a police report that should have been disclosed to the defense under Rule 9.01 of the Minnesota Rules of Criminal Procedure. The prosecutor's use of the report to impeach a very important defense witness allegedly had such a prejudicial effect that a mistrial was required, both as a sanction against the state and as a measure to ensure defendant a fair trial.

The state had listed both Ragland and the police officer in its pretrial list of intended witnesses. The state, however, never called Ragland as a witness because it was never successful in locating her. The defense did call her as a witness. Appellant argues that listing Ragland as an intended witness has the effect of requiring disclosure under the rules. The state argues that the rule is activated only when the witness is called and, since only the defense called Ragland as a witness, the state was under no obligation to disclose the police report.

Minn.R.Crim.P. 9.01, subd. 1(1)(a) provides:

The prosecuting attorney shall disclose to defense counsel the names and addresses of the persons whom he intends to call as witnesses at the trial together with their prior record of convictions, if any, within his actual knowledge. He shall permit defense counsel to inspect and reproduce such witnesses' relevant written or recorded statements and any written summaries within his knowledge of the substance of relevant oral statements made by such witnesses to prosecution agents.

This court addressed a similar situation in *State v. Olkon,* 299 N.W.2d 89, 102 (Minn. 1980), *cert. denied,* 449 U.S. 1132, 101 S.Ct. 954, 67 L.Ed.2d 119 (1981). In *Olkon,* the state failed to disclose an investigative interview with a doctor who had examined a witness prior to trial. The state had listed, but never called, the witness as a state witness. The witness was called by the defense. The court found no prejudice from the failure to disclose the report because the defense had a copy of the report at trial and submitted it into evidence. The court further stated that Rule 9.01 was not violated because the witness appeared for the defense and not the state.

In *State v. Schwantes,* 314 N.W.2d 243 (Minn.1982), this court reversed because of discovery rule violations by the state. The prosecutor had requested a report by an agent of the Bureau of Alcohol, Tobacco and Firearms. The report discredited the defendant's alibi. It consisted of a statement by defendant's wife that was inconsistent with her testimony at trial. The prosecution failed to disclose the report to the defense, despite the defense's continuing demand for discovery, and used it to impeach the wife's testimony. This court found the report crucial to the defense's trial strategy and stated that a new trial was required "to insure that the reciprocal discovery rules adopted by the court are observed by both the prosecution and the defense." *Id.* at 245.

In *State v. Zeimet,* 310 N.W.2d 552 (Minn. 1981), this court reversed based on the prosecution's failure to disclose prior to trial certain information concerning the culpability of a person closely connected to the case. The information was deemed important in its own right to the defense and, further, it might well have led the defense to far more useful information. *Id.* at 553. The case was remanded due to the closeness of the case, the importance of the evidence, and the lack of justification for the prosecutor's failure to disclose.

In *State v. Lindsey,* 284 N.W.2d 368 (Minn.1979), this court articulated four factors the trial court should consider in deciding whether to impose sanctions on a prosecutor who violates rules of discovery: 1) the reason why disclosure was not made; 2) the extent of prejudice to the opposing party; 3) the feasibility of rectifying that prejudice by a continuance; and 4) other relevant factors. The imposition of sanctions, however, is a matter particularly suited to the judgment and discretion of the trial court. *Id.* at 373.

█ In the instant case, this court must decide if the trial court's failure to grant a new trial or to strike the challenged evidence was a clear abuse of discretion. It seems clear that no such abuse is present.[2]

While whether any violation occurred is a close question, we believe there was a violation of the intent of the rule. The defense did not know of the existence of the report until it had been used during trial. Recent cases and the view embodied in the proposed rules indicate that a violation was committed. The prosecutor, however, did not commit an intentional violation. He argued that there was no obligation to disclose because the state did not call Ragland, the defense did. This view is arguably supported by past cases. Thus, under the first *Lindsey* factor, even if a violation was committed, it was done under a good faith belief that the act was not a violation.

The extent of any prejudice to defendant is minimal. The witness impeached by use of the challenged report was not a witness to the shooting. The crucial issue in the trial was who pulled the trigger. Ragland was not present and had nothing to contribute to resolve this issue. The substance of her challenged testimony goes to the defendant's activities after the shooting and defendant's state of mind as to whether he was wanted for murder in Minneapolis. The questioning was halted as soon as defense counsel objected and no further questions, based on the challenged report, were allowed. The worst effect the challenged testimony could have had was to impeach the credibility of a witness who had nothing to contribute to the main issue in the case. Thus, little or no prejudice was suffered by the defense.

Even if a violation of discovery rules occurred, as the trial court found, the judge did not abuse his discretion in denying the mistrial motion. No reversible error was committed because little or no prejudice resulted from the error.

3. Appellant argues that statements made by the prosecutor in final argument were improper and, when viewed together with other claimed errors, constituted error sufficient to require a new trial.

The allegedly improper portion of the argument consists of three statements:

> Now, one of the things that I imagine will be discussed by Mr. Widseth is the fact that the State did not call Donna Barrow as a witness. No doubt about that, we didn't. We have an obligation to assess the evidence to be placed before you, an obligation to attempt to assess whether or not it's believable and credible and honest and not perjured.

> \*   \*   \*   \*   \*   \*

> Finally, let's look at the defendant's predisposition to lie.

> \*   \*   \*   \*   \*   \*

---

2. Proposed amendments to the Rules of Criminal Procedure, currently being considered by this court, would impose a greater burden on the prosecutor to disclose relevant evidence. The proposed comments to Rule 9.01, subd. 1 state:

    Intentional abuses of the discovery process by the prosecution will not be tolerated and will result in reversal of the judgment of conviction when the facts warrant that. *State v. Smith,* 313 N.W.2d 429 (Minn.1981), *State v. Zeimet,* 310 N.W.2d 552 (Minn.1981).

    Additionally even negligent failures by the prosecution to disclose under the rules will require a new trial for a convicted defendant when prejudice is shown even though there is otherwise sufficient evidence on the record to support the conviction. *State v. Schwantes,* 314 N.W.2d 243 (Minn.1982), *State v. Hall,* 315 N.W.2d 223 (Minn.1982). Proposed Amendments to Minnesota Rules of Criminal Procedure, comments to Rule 9.01, *published in* 325 N.W.2d No. 4 (1982).

The defendant is a man who finds it easier to lie than to tell the truth.

These statements were reasonable inferences from evidence in the record. The statements regarding the appellant's propensity to lie were drawn from the appellant's admissions during trial of past lies. The reference to witness Barrow was prompted by the fact that, in its opening statement, the state informed the jury that Barrow would testify for the state. Her changed testimony caused her to be called by the defense. Some explanation for this was permissible. Nevertheless, we believe the prosecutor went beyond the scope of proper argument when he injected the prestige and discretion of the city attorney's office as a reason for failure to call Barrow.

■ A prosecutor's argument, however, must be taken as a whole to determine if it provides a basis for reversal. *See State v. Gulbrandsen,* 238 Minn. 508, 57 N.W.2d 419 (1953). The standard of review was stated in *State v. Caron,* 300 Minn. 123, 127–28, 218 N.W.2d 197, 200 (1974):

The test of determining whether prosecutorial misconduct was harmless depends partly upon the type of misconduct with which we are dealing. That is, the more serious the misconduct, the more certain of its effect this court has felt that it should be before labeling the error harmless. Thus, in cases involving usually serious prosecutorial misconduct this court has required certainty beyond a reasonable doubt that the misconduct was harmless before affirming. * * * On the other hand, in cases involving less serious prosecutorial misconduct this court has applied the test of whether the misconduct likely played a substantial part in influencing the jury to convict.

■ Thus, though portions of the argument were improper, no reversible error was committed. First, the defense did not object during closing argument, thus forfeiting the right to have the issue considered on appeal. *State v. Lloyd,* 310 N.W.2d 463, 465 (Minn.1981); *Spears v. State,* 300 N.W.2d 173 (Minn.1980). Second, the failure to object implies that the de-

fense found nothing improper in the argument. *See State v. Marquetti,* 322 N.W.2d 316 (Minn.1982). Finally, the less serious nature of the conduct challenged here requires that, for reversal, the misconduct likely played a substantial part in influencing the jury to convict. This standard was clearly not met.

4. Appellant's final argument is that the evidence presented at trial was not sufficient to support identification of defendant as the man who shot Bridges and Palmer. The issue for this court is whether the jury could reasonably have found the defendant guilty viewing the evidence in the light most favorable to the verdict. *State v. Spaulding,* 296 N.W.2d 870, 876 (Minn. 1980); *State v. Wahlberg,* 296 N.W.2d 408, 411 (Minn.1980).

■ Appellant points to numerous inconsistencies in the testimony of the various witnesses and stresses evidence that supports appellant's version of events. The argument is unpersuasive. The fact remains that Palmer identified Daniels as the man who shot him. His version of the events of that night is supported by portions of other witnesses' testimony, as is appellant's version. The jury apparently believed Palmer, not Daniels, and could reasonably have done so. The evidence is not insufficient as a matter of law.

The convictions are affirmed.