STATE of Minnesota,
Petitioner, Appellant,

v.

Kurt Dean DOUGHMAN, Respondent.

No. C7-84-1347.

Supreme Court of Minnesota.

April 4, 1986.

---

Hubert H. Humphrey, III, State Atty. Gen., Peter K. Halbach, Robert A. Stanich, Sp. Asst. Attys. Gen., St. Paul, John Dimich, Itasca Co. Atty., Grand Rapids, for appellant.

C. Paul Jones, State Public Defender, Steven P. Russett, Asst. State Public Defender, Minneapolis, for respondent.

SCOTT, Justice.

This appeal stems from the conviction of Kurt Dean Doughman of attempted assault in the first degree, attempted arson in the third degree and unlawful possession of explosives. The Minnesota Court of Appeals reversed the conviction and remanded for a new trial, holding that the trial court erred in admitting certain *Spreigl* evidence. The state seeks further review of the appellate court's decision. We affirm.

At approximately 9:00 a.m. on February 16, 1984, Officer Steven Kovacic of the Itasca County Sheriff's Department was summoned to the home of Clarence Carlton in rural Itasca County. Carlton lived with his 86-year-old mother in a small house heated solely by a woodburning stove. Carlton had called the sheriff's department after he noticed that his ax was missing from the woodpile in his yard and after he discovered footprints in the snow near his driveway. Officer Kovacic observed the area and found a set of bare footprints from the road to the woodpile and back. Before leaving, Officer Kovacic photographed and measured the prints.

After the officer left, Carlton found a handle for the head of an old ax he owned, and went about doing his chores for the day. That evening, Carlton began splitting firewood and, upon splitting a piece of birch he found near the door of his house, he noticed a metal pipe glued inside the wood. Discovering what he thought was a pipe bomb, Carlton immediately called his neighbor, Merlin Mourer, who, upon arriving at the Carlton home and investigating the pipe, called the sheriff's department.

Officers Kovacic and Oakley responded to the call and arrived at the Carlton residence at approximately 6:00 p.m. They examined the piece of firewood that had been split open, exposing the 8-inch cylindrical metal pipe inside. Officer Kovacic recognized the pipe to be some type of bomb and immediately confiscated it for further examination. When asked by Officer Kovacic who he thought had planted the bomb, Carlton responded with the name of Kurt Doughman.

Carlton, who was 52 years old at the time of trial, had known Doughman, who was 24, most of Doughman's life. Until sometime in late 1983, the two men were friends. Their friendship became strained when Doughman apparently failed to pay Carlton for telephone calls he had made at Carlton's home and collect calls Carlton had received from Doughman.

At the time of the offense, Doughman lived 45 miles from Carlton's residence in a house owned by a friend, William McGowan. McGowan resided in a trailer next to the house. A driveway, which ran between the two structures, was used by both McGowan and Doughman. Doughman had moved some buildings onto the land and McGowan requested that he move them farther away from the public road running

in front of the property. Thus, on the night of February 15, 1984, Doughman was welding a metal roller, one of many that would facilitate moving the buildings.

McGowan assisted Doughman in welding that night. McGowan, who owned welding equipment, helped Doughman set up the equipment in front of his trailer. Thereafter, Doughman retrieved a 6–8 inch pipe and end caps from his house. Welding the end cap to the pipe reinforced the pipe and would prevent it from collapsing when used as a roller to move the buildings. Doughman had difficulty welding the end caps and eventually McGowan welded them himself. After one roller was made, McGowan and Doughman drank coffee in McGowan's trailer until 10:30 p.m., when Doughman returned to his house next door.

·On February 18, 1984, Officer Oakley obtained and executed a search warrant for Doughman's house. Doughman was arrested the same day and charged with two counts of attempted murder in the first degree, one count of attempted arson in the first degree, and one count of possession of explosives. At the omnibus hearing before the Ninth Judicial District Court, the items seized during the search of Doughman's house on February 18 were held to be inadmissible at trial.

A jury trial commenced on April 24, 1984. In several pretrial orders the court ruled that Doughman's prior criminal record, which included convictions for theft and the sale of marijuana, would be admitted only for impeachment of Doughman if he testified. The court also ruled that the reference by Carlton to Officer Kovacic that he thought Doughman had planted the pipe bomb would be inadmissible as an accusatory statement without any foundation or personal knowledge. In addition, the court ruled that the state would be precluded from eliciting testimony from Carlton wherein Carlton would state that Doughman had once told him he was going to burn down a barn owned by a man named Allen Reinarz, whom Doughman disliked. However, the testimony could be used, the court ruled, if the defense in cross-exam-

ining Carlton "opened the door" by challenging Carlton's reasons for suspecting Doughman.

At trial, a crime laboratory analyst from the Minnesota Bureau of Criminal Apprehension (BCA) testified that an analysis of the pipe bomb found by Carlton revealed that the pipe contained 0.975 pounds of black gunpowder. An employee of the Bureau of Alcohol, Tobacco and Firearms testified that the amount of black gunpowder found in the pipe would have been sufficient to cause fragments of the pipe to be projected, had the birch chunk containing it been burned, and sufficient to cause the stove itself to explode, resulting in secondary fragments being projected. He testified that multiple fires would likely have resulted from the explosion. A crime laboratory analyst with the Minnesota Crime Laboratory testified that although the footprints found near the Carlton home were nine and one-half inches long by three and one-half to four inches wide, and Doughman's right foot was ten inches long and three and three-quarters inches wide, she could not reach a conclusion as to whether the footprints in the photograph matched the ink impressions of Doughman's feet.

Carlton testified to his discovery of the pipe bomb on February 16. Although the court refused to allow him to state that he suspected Doughman had planted the bomb, Carlton was allowed to testify that some two and one-half years earlier Doughman had threatened to burn Allen Reinarz's barn and that, in fact, the barn did burn down. In a pretrial order, the court had disallowed such testimony unless the defense "opened the door" during its cross-examination of Carlton, but after conducting a mid-trial *Spreigl* hearing, the court allowed Carlton to so testify during the state's direct examination of him.

William McGowan, Doughman's neighbor and owner of the house Doughman lived in, also testified. Upon examining the pipe that was found in the firewood, McGowan stated that the pipe he helped Doughman weld on February 15 was "similar" except that the pipe found in the firewood had a

hole in it on one end and a threaded bolt on the other end, features that the pipe he helped Doughman weld did not have. In addition, McGowan testified that after he and Doughman finished welding on the night of February 15, Doughman's two pickup trucks were blocked in the driveway by McGowan's car. Doughman did own a car that was not blocked by McGowan's car; however, it had no muffler and made excessive noise when operated. McGowan stated that he was not disturbed by the noise of any vehicle during the night and that he could not recall hearing any of his 14 racing dogs barking after he retired to his trailer.

After the state rested, the defense read into evidence a conclusion reached by the BCA laboratory analyst, which stated that the bolt present in the pipe found by Carlton showed the presence of flux, indicating that the bolt was present in the pipe when the end cap was welded into place. No witnesses were called by the defense. Doughman did not testify.

On April 27, 1984, the jury reached a verdict. On Count I, accusing Doughman of attempted murder in the first degree, the jury found Doughman guilty of attempted assault in the first degree. On Count II, accusing Doughman of attempted first-degree murder in the course of attempting to commit a felony, the jury found the defendant not guilty. On Count III, alleging attempted arson in the first degree, the jury found Doughman guilty of attempted arson in the third degree (the court mistakenly submitted a form entitled arson in the third degree—the jury was only instructed on the elements of arson in the first degree). On Count IV, alleging unlawful possession, manufacture or transportation of an explosive, the jury found Doughman guilty.

The court sentenced Doughman to 60 months for attempted assault in the first degree. The court did not impose a sentence for Doughman's other two convictions. The 60-month sentence represented an upward durational departure from the presumptive Minnesota Sentencing Guidelines sentence of 32½ months.

The court of appeals reversed the conviction, holding that Carlton's testimony concerning Doughman's alleged involvement in the Reinarz barn fire, testimony that was allowed after the trial court conducted a mid-trial *Spreigl* hearing, should not have been admitted. The appellate court noted:

The trial court erred in finding that the evidence was clear and convincing that Doughman was involved in the Reinarz fire. The *only* evidence presented at the mid-trial *Spreigl* hearing was the testimony of Carlton. Carlton testified that Doughman threatened to burn down Reinarz's barn two days before it happened. Carlton did not know when the fire took place and he admitted that he did not inform investigators of Doughman's alleged threat at the time. The State did not establish or attempt to establish the cause of the Reinarz's fire or even whether it was set by arson. At a minimum, the State should have had testimony establishing that Reinarz's barn burned down because of arson.

*State v. Doughman,* 368 N.W.2d 357, 359 (Minn.Ct.App.1985) (emphasis in original). The appellate court did not reach the other issues raised in Doughman's appeal.

We granted the state's petition for further review to discuss whether the trial court properly admitted the *Spreigl* evidence.

■ A fundamental principle of evidentiary law, derived from longstanding case law, precludes the introduction of evidence of other crimes or bad acts committed by a defendant to show that the defendant acted in conformity therewith. *See State v. Johnson,* 256 N.W.2d 280, 286 (Minn.1977); *State v. Sweeney,* 180 Minn. 450, 455, 231 N.W. 225, 227 (1930); *see also* Minn.R.Evid. 404(b). Evidence of other crimes or bad acts, however, is admissible to prove the current accusation against a defendant when such evidence tends to establish a common scheme or plan embracing the commission of similar crimes "so related to each other that proof of one or more of

such tends to establish the [current] accusation." *Sweeney*, 180 Minn. at 455, 231 N.W. at 227; *see also State v. Spreigl*, 272 Minn. 488, 139 N.W.2d 167 (1965).[1] Here, the trial court ruled, after conducting a mid-trial *Spreigl* hearing, that the "common scheme" exception applied. The court thus allowed Carlton to testify on direct examination that Doughman had threatened to burn down the Reinarz barn some two and a half years previously and that, in fact, the barn had burned down.

We will not reverse a trial court's admission of evidence of other crimes or bad acts unless an abuse of discretion is clearly shown. *State v. Ture*, 353 N.W.2d 502, 515 (Minn.1984); *State v. Johnson*, 256 N.W.2d 280, 286 (Minn.1977). However, we have noted that in order for such evidence to be admissible the trial court must determine that there is "clear and convincing" evidence that the defendant participated in the crimes or bad acts sought to be admitted. *State v. Billstrom*, 276 Minn. 174, 179, 149 N.W.2d 281, 285 (1967). The court must also determine that the evidence of prior crimes or bad acts is "relevant and material to the state's case." *State v. Morrison*, 310 N.W.2d 135, 137 (Minn.1981). In addition, it must rule that the probative value of the evidence outweighs any potential for "unfair prejudice." *State v. Bolts*, 288 N.W.2d 718, 719 (Minn.1980). Doughman contends that the trial court erred in determining that there was clear and convincing evidence to establish that he participated in the Reinarz fire. We agree.

■ In conducting the *Spreigl* hearing to determine the admissibility of the alleged prior act of arson, the court heard only from Carlton, the man who suspected that Doughman had planted the pipe bomb in his yard. At the hearing Carlton testified that Doughman had made a statement in the presence of Carlton, Carlton's mother, and a man named Tim Bresnahan in which he threatened to burn down Reinarz' barn. Neither Carlton's mother nor Bres-

nahan corroborated Carlton's testimony. Carlton further noted that some two days after the statement was made, Reinarz' bard did, in fact, burn down. Carlton could not recall, however, the month or year in which the Reinarz fire occurred. The transcript reads:

THE COURT: * * * when did that fire take place and when was that conversation that he had with Doughman?

MR. BODIEN [counsel for the state]: Your Honor, it's at least two and a half years ago.

THE COURT: Well, at least means—is it 100 years ago or how long?

MR. BODIEN: Mr. Carlton, how long was it?

THE WITNESS [Carlton]: It's about two and a half years, it was—it was prior to—well, we were close friends at that time.

\* \* \* \* \* \*

MR. MATURI [defense counsel]: Can you give us an approximate time as to what—you say two and a half years ago, can you give us the month and the year?

THE WITNESS: No, I can't, but it certainly is in the records of Ronnie Linder.

MR. MATURI: It may be, but we haven't had a chance to check those because we didn't have notice. Was there snow on the ground at the time?

THE WITNESS: Yes, there was.

Carlton also admitted he did not inform the authorities of Doughman's threat:

MR. MATURI: And did you ever tell the authorities after the Reinarz barn burned that Mr. Doughman had said these things?

THE WITNESS: No, I did not.

MR. MATURI: You didn't?

THE WITNESS: No.

MR. MATURI: Why didn't you tell the authorities?

THE WITNESS: Why didn't I tell the authorities? Well, I thought it best not

---

1. Evidence of other crimes or bad acts is also admissible if it tends to establish: motive; intent; absence of mistake or accident; sex crimes; or the identity of the accused. *See State v. Clark*, 296 N.W.2d 359, 368 (Minn.1980).

to tell the authorities because of—of a few conditions in my household.

MR. MATURI: Was Mr. Doughman ever charged with this crime of burning down that barn?

THE WITNESS: No, but Sheriff Ronnie Linder at Mizpah examined it.

MR. MATURI: Did you talk to Deputy Linder?

THE WITNESS: Yes, I did.

MR. MATURI: And you didn't tell Deputy Linder about this?

THE WITNESS: About—

MR. MATURI: About what Kurt had told you?

THE WITNESS: No, no.

We have recognized that it is the function of the trial court to weigh the credibility of a witness appearing before it. *State v. Pieschke*, 295 N.W.2d 580, 584 (Minn. 1980). Even taking the testimony of Carlton as true, however, the state did not clearly and convincingly establish that Doughman participated in the Reinarz fire. No evidence was submitted establishing that a prior act of arson had even been committed; Carlton's testimony only established that a fire had occurred in the Reinarz barn, not that the fire had been intentionally torched.

In seeking to admit evidence of a prior crime or bad act, the state must establish that some prior crime or bad act occurred. At a *Spreigl* hearing, all the elements of the prior crime or bad act must be presented. Here, a prior act of arson was alleged to have taken place. No evidence, however, was adduced at the *Spreigl* hearing that would permit the judge to find that the fire was of incendiary origin. Thus, the fact that a prior crime or bad act had even occurred was in doubt.

█ The court's decision to admit the *Spreigl* evidence was not harmless error. In direct contravention of the Minnesota Rules of Criminal Procedure, the state did not notify Doughman of its intent to elicit the testimony concerning the prior act. Minn.R.Crim.P. 7.02 requires the prosecuting attorney to notify the defendant or defendant's counsel, in writing, of any offenses the evidence of which may be offered under any exception to the general exclusionary rule. *Spreigl* evidence is admitted under an exception to the general exclusionary rule enunciated in Rule 404 of the Minnesota Rules of Evidence, and the state in this case failed to provide written notice of its intent to use such evidence. In a pretrial order, the trial court specifically ruled that the state could not elicit from Carlton, on direct examination, information concerning Doughman's possible involvement in a fire in Reinarz' barn. It was only later, at trial, when the court was examining Carlton in chambers to determine whether he would accidentally testify to his suspicion that Doughman had planted the bomb (a statement which the court had earlier ruled inadmissible), that the state requested that it be permitted to elicit testimony concerning the Reinarz fire on direct examination of Carlton. The court then conducted a mid-trial *Spreigl* hearing in chambers.

Because of the lack of notice that the state would introduce such testimony, Doughman had no opportunity to gather evidence to rebut the testimony of Carlton; he was unable to investigate the facts of the fire in Reinarz' barn. In *Spreigl*, we recognized that the introduction of evidence of prior crimes or bad acts may result in the jury's convicting the accused, not because the accused is guilty of the current charge, but because he or she may have escaped punishment for previous offenses or may have performed previous acts that are similar to the current charge. In light of these concerns, we stated:

> Although the responsibility for weighing the delicately balanced and conflicting considerations involved in receiving prior related misconduct is largely within the discretion of the trial court, we conclude that we have gone as far as we think proper in approving its admissibility. Because of the serious misgivings we have long entertained in this connection, we now hold that in the trial of this and future criminal cases where the state seeks to prove that an accused has been

guilty of additional crimes and misconduct on other occasions, although such evidence is otherwise admissible under some exception to the general exclusionary rule, it shall not hereafter be received unless within a reasonable time before trial the state furnishes defendant in writing a statement of the offenses it intends to show he has committed, described with the particularity required of an indictment or information * * *.

272 Minn. at 496–97, 139 N.W.2d at 172–73 (footnote omitted). The notice procedure serves to guard against the injustice of using evidence against an accused who is unprepared to demonstrate that such evidence is unsubstantiated. Here, the notice procedure was not followed, and the likelihood that the introduction of such evidence may have resulted in an unjust verdict compels us to agree with the court of appeals that the trial court's error was prejudicial and a new trial must be granted.

Affirmed.