**STATE of Minnesota, Respondent,**

v.

**Simon John CICHON, Appellant.**

No. C4–89–1874.

Court of Appeals of Minnesota.

Aug. 14, 1990.

Review Denied Sept. 28, 1990.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Thomas L. Johnson, Hennepin Co. Atty., Beverly J. Wolfe, Asst. Co. Atty., Minneapolis, for respondent.

William M. Orth, Bloomington, for appellant.

Considered and decided by RANDALL, P.J., and FOLEY and SCHULTZ,* JJ.

## OPINION

FOLEY, Judge.

Simon John Cichon appeals his conviction of criminal sexual conduct in the second degree. He challenges the introduction of *Spreigl* evidence and sufficiency of the evidence. We affirm.

## FACTS

On March 27, 1989, Cichon was charged with one count of criminal sexual conduct in the second degree, which was alleged to have occurred between August 1, 1982 and December 8, 1983 with his granddaughter, H.S.

Simon and Delphine Cichon's daughter Linda and her former husband Rick are the parents of H.S., who was born in February 1978. The Cichons cared for H.S. while Linda and Rick were married. Linda went into treatment for alcohol abuse in September 1980 and the Cichons continued to care for H.S.

Linda and Rick were divorced in June 1981. Their son M.S. was born on September 17, 1981. M.S. has always lived with Linda. Linda subsequently remarried and had another child in 1984.

In October 1983, Rick married his present wife, Val. They and H.S. moved away in December 1983. When Linda had visitation, H.S. would go to the Cichons' house.

Delphine testified H.S. was out of diapers at age three and never inappropriately defecated. Rick testified H.S. wore diapers until about age four and defecated in her pants until about six months before trial.

---

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 2.

Val testified H.S. was out of diapers at age five but was still "soiling in her pants and smearing it."

After they moved, Rick and Val sought professional help. Mary Lynn Harrison, H.S.' most recent counselor, testified H.S.' treatment file showed Rick and Val were concerned about sexual abuse. A pediatrician examined H.S. in 1984 and found no physical evidence of sexual abuse.

H.S. was diagnosed as having primary encopresis (never fully toilet trained). Harrison testified encopresis is common in sexually abused children. She conceded other trauma between the ages of two and three could interrupt toilet training. She also testified H.S. showed other signs consistent with sexual abuse, including drawing a grossly distorted picture of herself and having recurring nightmares with sexual content and death images.

Rick testified he began to seek custody of M.S. in the fall of 1987. A hearing on M.S.' custody was scheduled for December 9, 1988. In November 1988, Val found a note H.S. had written with sexual references. H.S. told her Cichon had made H.S. come into the bathroom with him and watch while he had bowel movements. According to Rick, in late 1988, H.S.' counselor asked if they were sure H.S. had not been sexually abused. Rick testified:

> And so I asked [H.S.] again, I asked, "Have you ever been sexually abused?" And she said, "I don't know." And she walked off. And so my wife said maybe she doesn't know what you are talking about. And I called her back to the kitchen and I explained what it was and then she said, "I don't think so." And she walked off again. And she come back and told us about her grandpa making her go to the bathroom. She said, "I don't know if this is or not." But then she told us that story.

Val called Harrison on November 11, 1988 and told her about the note and what H.S. had told. Harrison did not report this because she wanted to talk to H.S. during counseling.

Harrison testified Val called her on the morning of the next session and said H.S. had reported vaginal penetration. Harrison did not call child protection because Val already had. Val testified H.S. had given this further information in early December after Val told H.S. she could not go to the Cichons' at Christmas. Val did not want H.S. to see Cichon until more was learned about Cichon forcing H.S. to watch his bowel movements. H.S. later said Cichon had made her touch his penis and had touched her vagina and nipples. Val said H.S. also talked about Delphine finding Cichon rubbing H.S.' naked buttocks. Rick's testimony was consistent with Val's.

Harrison testified that when H.S. came in to see her

> she said that she remembers when she was younger and her grandparents used to be taking care of her that he would put his finger in her vagina while he was changing her diaper. And also he would make her come into the bathroom with him, grab her by the arm and take her into the bathroom with him, have her watch him take a bowel movement and also then touch his penis.

Harrison testified H.S. drew a picture of herself as a whole person without distortion in January 1989 and her encopresis had largely disappeared by April 1989.

Val called on December 5, 1988 and reported what H.S. had told her to Sergeant Susan Piontek of the Minneapolis Police Child Abuse Unit. Piontek had Val and H.S. come to the station. H.S. told Piontek Cichon had often sat on the toilet and had H.S. touch his penis, had put his fingers in her vagina, had rubbed or pinched her nipples and had hugged her and rubbed her buttocks when she was naked.

On December 8, 1988, Cichon and Delphine went to the station. Piontek noted in her report that she told Cichon H.S. had made allegations in a therapy session. She testified she thought if she told Cichon Val had given her the information they would get sidetracked into discussing Val's credibility. Piontek wanted to interview Cichon before he heard about the allegations at the custody hearing.

Piontek testified Cichon said he had had contact but it was not sexual. Piontek told him she meant the kind of contact adults had. Cichon then admitted he had that kind of contact. Cichon asked for Delphine to come in the room. Piontek testified Cichon admitted sexual touching when Delphine was in the room. Delphine began crying and Cichon recanted. Piontek told him, "This isn't going anywhere, I am going to leave." Cichon then made further admissions and Piontek asked for a recorded statement.

According to Piontek, when they were on their way to the steno room, Cichon said he really did not touch H.S. sexually but wanted to give a statement saying he did to keep H.S. from going through a trial. Piontek refused to take a statement under those circumstances.

At trial, Cichon denied touching H.S. in a sexual way. He said he might have touched her vagina when he applied salve or was playing with her. He denied admitting to sexual contact and being asked for a written statement. Delphine contradicted Cichon's testimony that he was not asked to make a written statement. She testified Cichon told Piontek he would give a written statement saying he had sexually abused H.S., but only to spare H.S. a trial.

H.S., who was 11 years old at the time of trial, testified Cichon had touched her in a bad way before the move in 1983. She testified Cichon had touched her vagina, "boobs" and "butt." She also testified he had made her touch his penis while he was "taking a dump." She testified this happened at the Cichon house and once at the house of "Butch." H.S. also testified to a time Cichon picked her up and rubbed her naked "butt." She said Delphine asked him what he was doing with H.S. stark naked and he said, "Nothing."

According to H.S., she had not told about the incidents earlier because she thought it was what "grandpas were supposed to do," and she thought her grandparents would hate her if she told. H.S. testified she did not say what she said so she could go to the Cichon house or because of the custody dispute.

Linda was called as a *Spreigl* witness and testified that, when she was 12 years old her father came into her bedroom while she was in bed and put his hand under her nightgown on her breast and said, "Oh, I thought you were mom." Linda first reported the incident while in therapy in 1987. It was stipulated on the record that Delphine would confirm Linda told her about the incident in 1987.

Cichon was convicted by jury verdict on August 10, 1989.

## ISSUES

1. Did the trial court err in its admission of *Spreigl* evidence?

2. Was the evidence sufficient to sustain the conviction?

## ANALYSIS

■ 1. On appeal, trial court admission of *Spreigl* evidence will not be reversed unless a clear abuse of discretion is shown. *State v. Rainer*, 411 N.W.2d 490, 497 (Minn.1987). The evidence must (1) be clear and convincing, (2) be relevant and material and (3) have probative value outweighing prejudicial effect. *State v. Doughman*, 384 N.W.2d 450, 454 (Minn. 1986).

■ Linda first testified outside the hearing of the jury. The trial court found the evidence admissible, saying:

First of all, with respect to the credibility of the witness, the court found the witness credible and believes that the existence of the incident has been established by clear and convincing evidence for the purposes of Rule 404(b). And I am aware of the history of the witness and the fact that she was upset. It seems to me that the fact she has had mental problems [is], of course, of some relevance but she seemed to me to make very careful distinctions in answers to questions of the prosecution. Her being upset was understandable, it is a difficult thing to talk about she was in a situation where she was confronting her own father in the courtroom.

With respect to her mental condition and instability, she has had problems; she has not had any medicine between one-and-a-half and two years according to her testimony, any antidepressant medication. And there was no indication of any kind of incompetence. And her manner and bearing as a witness was credible to this court.

Now, the court also must deal with the question of similarities of the incidences. And the court does believe that there is sufficient similarity even though they are not identical. And the crucial issue is they both involve intrafamilial sex abuse of children or grandchildren. And the alleged conduct of [Cichon] with respect to his daughter was similarly involving a touching of the breast area. There was an issue of sexual touching as part of what is—of [H.S.] the grand-daughter—is what is involved in this case.

Counsel for [Cichon] has argued well and has contended that this was not really sexual in nature. However, the court does not find that argument persuasive given the fact that the testimony was that [Cichon] touched his daughter under her nightgown that that seems to the court to be in a sexual [context]. And the statement of the officer indicates again the kind of excuse given by [Cichon], is not identical, but indicates a kind of admission of the incident with a denial of its sexuality which is similar in both incidents, comparing the evidence that Sergeant Piontek has given today and the testimony yesterday.

Now the time consideration is of great concern to the court and I have thought very carefully about it which is when I began reviewing the legal issues in this matter before it was argued. And I heard the testimony yesterday and I read the cases and I have had a chance to give some consideration. And I think in a situation of this kind that it is sufficiently important to the State and also that it falls within the parameters of time in some cases. And the time limits in the cases I have reviewed are normally between the time of the prior incident and the time of the incident with which [Cichon] is charged. And by the nature of them these incidents are frequently suppressed for long periods of time and I think it does have relevance and probative value for the jury which under the circumstances outweighs the prejudicial effect.

We agree with the trial court the evidence of the other crime was clear and convincing. The trial court found Linda's testimony credible, and the stipulation provided further support. Furthermore, Linda reported the incident long before H.S.' allegations. *Cf. State v. Casady,* 392 N.W.2d 629, 632 (Minn.App.1986), *pet. for rev. denied* (Minn. Sept. 24, 1986).

We also find the evidence of the other crime was relevant and material. In order to meet the test, the other crime must be similar to the crime charged. *State v. Filippi,* 335 N.W.2d 739, 743 (Minn.1983). These two crimes both occurred in Cichon's home and involved the touching of a female child's sexual parts. Cichon used a position of authority and as a caretaker to commit both offenses. *See Jackson v. State,* 447 N.W.2d 430, 433 (Minn.App. 1989); *State v. McCoy,* 400 N.W.2d 807, 809–10 (Minn.App.1987), *pet. for rev. denied* (Minn. March 25, 1987). Cichon also claimed both touchings were accidental and not sexual.

Cichon argues the 14–year time gap between the two offenses made the *Spreigl* evidence inadmissible. The length of time, however, is but one factor.

"Generally, the greater the similarity of the other crime to the crime charged in time, place or modus operandi, the greater the chance that the other crime is relevant." *We have been flexible in applying this "test" on appeal, upholding admission notwithstanding a lack of closeness in time or place if the relevance of the evidence was otherwise clear.*

*State v. DeBaere,* 356 N.W.2d 301, 305 (Minn.1984) (quoting *State v. Matteson,* 287 N.W.2d 408, 411 (Minn.1979) (emphasis added). Admission has been upheld even though the time is not close if the evidence

is clearly relevant. *Id.* at 304–05; *see McCoy,* 400 N.W.2d at 809–10 (sexual abuse 14 years before admissible because of similarities).

In light of *DeBaere* and the trial court's thoughtful statement on the record, which reflects careful use of the trial court's discretion, we find the time gap did not render the *Spreigl* evidence inadmissible.

The probative value of the other crime evidence also outweighed its prejudicial effect. *See Seelye v. State,* 429 N.W.2d 669, 672 (Minn.App.1988). Cichon tried to impeach H.S.' and corroborating testimony by suggesting fabrication motivated by the custody hearing. Linda's testimony was seemingly against her self-interest and also was consistent with H.S.' allegations. Additionally, her testimony was probative as to intent. Finally, Cichon opened the door by eliciting evidence his other two grandchildren did not report abuse.

The trial court also guarded against undue prejudice by following the procedure as set out in *State v. Billstrom,* 276 Minn. 174, 178–79, 149 N.W.2d 281, 284–85 (1967). *See State v. Waukazo,* 374 N.W.2d 563, 565 (Minn.App.1985), *pet. for rev. denied* (Minn. Nov. 1, 1985).

2. In deciding whether the evidence was insufficient to sustain a conviction, the only issue is "whether the jury could reasonably have found [Cichon] guilty viewing the evidence in the light most favorable to the verdict." *State v. Daniels,* 332 N.W.2d 172, 180 (Minn.1983). This court does not try the facts again when reviewing the sufficiency of the evidence. *State v. Ellingson,* 283 Minn. 208, 211, 167 N.W.2d 55, 57 (1969). Our standard of review is

> whether, viewing the evidence and any reasonable inferences that could be drawn therefrom in a light most favorable to the state, the jury could reasonably find the defendant guilty beyond a reasonable doubt. In conducting this review, the court assumes the jury believed the state's witnesses and disbelieved evidence to the contrary. The jury determines the credibility and weight to be given the testimony of witnesses.

*State v. Boitnott,* 443 N.W.2d 527, 531 (Minn.1989) (quoting *State v. Buchanan,* 431 N.W.2d 542, 547 (Minn.1988) (citations omitted)).

The complainant's testimony need not be corroborated in a case of criminal sexual conduct. Minn.Stat. 609.347, subd. 1 (1988). A child's allegations of sexual abuse do not require corroboration unless the other evidence is insufficient. *State v. Myers,* 359 N.W.2d 604, 608 (Minn.1984). The absence of physical evidence is not controlling when the complainant's testimony is positive and consistent. *Myers,* 359 N.W.2d at 608.

Without finding corroboration was required, we note there is ample corroborating evidence in the record. The testimony shows H.S. made consistent statements to her parents, her therapist, the police and in her trial testimony.

H.S.' testimony was corroborated by Harrison's testimony. H.S. exhibited symptoms commonly found in sexual abuse victims: encopresis, nightmares and a distorted body image. Harrison also testified it was not unusual for children to have memories of events which took place when they were two years old or younger, nor was it unusual for victims of sexual abuse to repress memories of the sexual abuse for years. Linda's testimony was also corroborative.

As to Cichon's claim H.S.' report of abuse was motivated by the custody hearing, it is for the jury to determine credibility and weight to be given to testimony. *Boitnott,* 443 N.W.2d at 531. Cichon made these arguments to the jury and the jury was not persuaded by them.

Cichon points to a lack of specificity of detail. H.S.' testimony that Cichon touched her vagina, "boobs" and "butt," and that Cichon made her touch his penis may not have been "particularly detailed," but it was "positive and relatively consistent." *Marshall v. State,* 395 N.W.2d 362, 365 (Minn.App.1986), *pet. for rev. denied* (Minn. Dec. 17, 1986).

Cichon also points to inconsistency in the evidence about H.S. being at the house of

"Butch." The jury, however, was "fully apprised of discrepancies in the evidence." *State v. Bias*, 419 N.W.2d 480, 485 (Minn. 1988).

Cichon argues the theory H.S. suffered encopresis because of sexual abuse was rebutted by her not being brought in for treatment until six months after she no longer was in Cichon's daily care. The jury could find H.S.' problems were present long before.

The testimony of Piontek as to Cichon's admissions also substantially supports the conviction. Cichon's testimony was contrary to that of Piontek and Delphine. The jury was entitled to disbelieve Cichon's trial testimony that he never admitted sexually touching H.S.

### DECISION

Affirmed.

RANDALL, J., dissents.

RANDALL, Judge (dissenting).

I respectfully dissent. I would reverse Cichon's conviction based on the admission of the *Spreigl*[1] evidence. I believe the prejudicial effect of that evidence outweighed the probative value, if any, it had.

This case is another illustration of the indefinite standards surrounding the admission by Minnesota courts of so-called "*Spreigl* evidence"—*allegations* of prior misconduct against a defendant in a criminal prosecution. Cichon was on trial for criminal sexual conduct in the second degree for acts he was accused of committing in 1982–83. At trial, the state introduced *Spreigl* testimony from Cichon's daughter, Linda. She testified that in 1967 or 1968 Cichon entered her bedroom and placed his hand on her breast and said, "Oh, I thought you were mom." No contemporaneous record was ever made of that alleged event, Cichon was never investigated, much less prosecuted for that alleged contact, and a *14–year–period* elapsed between the

incident for which he was on trial and the alleged incident with his daughter. By the time of trial, more than 20 years had passed since the alleged sexual contact between Cichon and his daughter. Nevertheless, the trial court allowed the state to introduce this evidence against Cichon in his prosecution for criminal sexual conduct with his granddaughter. The court admitted the evidence to show common scheme, intent, and absence of mistake. For all practical purposes, once this testimony was admitted a conviction was assured.

As a general rule, evidence of prior alleged misconduct "is not admissible to prove the character of a person in order to show action in conformity therewith." Minn.R.Evid. 404(b); *see also State v. Doughman*, 384 N.W.2d 450, 453 (Minn. 1986). The reason for this general prohibition is that if evidence of prior misconduct is admitted to show that a defendant is a "bad person," a jury may convict based on the defendant's reputation alone. *See United States v. Cook*, 538 F.2d 1000, 1004 (3d.Cir.1976) (citations omitted); McCormick, *Evidence*, § 190 nn. 6–7 (3d. ed. 1984).

Prior misconduct or *Spreigl* evidence is, however,

> admissible to prove the current accusation against a defendant when such evidence tends to establish a common scheme or plan embracing the commission of similar crimes "so related to each other that proof of one or more of such tends to establish the [current] accusation."

*Doughman*, 384 N.W.2d at 453–54 (quoting *State v. Sweeney*, 180 Minn. 450, 455, 231 N.W. 225, 227 (1930)).[2] *Spreigl* evidence must satisfy a three-part test to be admissible. *See State v. Rainer*, 411 N.W.2d 490, 497 (Minn.1987). There must be

> clear and convincing evidence that the defendant participated in the crimes or bad acts, that the evidence is relevant

---

1. *State v. Spreigl*, 272 Minn. 488, 139 N.W.2d 167 (1965).

2. The evidence may also be admitted for the following purposes: "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake." Minn.R.Evid. 404(b).

and material to the state's case, and that the probative value of the evidence outweighs any potential for prejudice.

*Id.* The length of time between prior alleged misconduct and the acts for which a defendant is on trial reduces the relevancy and lowers the probative value of *Spreigl* evidence. *State v. Casady,* 392 N.W.2d 629, 633 (Minn.App.1986), *pet. for rev. denied* (Minn. Sept. 24, 1986).

In this case, 14 years passed between the alleged contact with Linda and the acts giving rise to the criminal prosecution. This lengthy time period between incidents makes the relevancy of the evidence tenuous at best. *See id.* at 633 (finding five or six years between prior misconduct and conduct giving rise to criminal prosecution reduced relevancy of *Spreigl* evidence). The lengthy time lapse does not, however, reduce the potential for unfair prejudice to defendants in Cichon's position. To guard against the danger of juries convicting criminal defendants of crimes based on the prejudicial effect of alleged prior misconduct, reasonable time limit safeguards, as we have for impeachment of past crimes, should be established for admission of *Spreigl* evidence.

In a parallel area, a 10–year general time limit is imposed on the use of prior convictions for impeachment purposes. Minn.R. Evid. 609(b).[3] The assumption on which the 10–year limit is based is:

> that after such an extended period of time the conviction has lost its probative value on the issue of credibility.

Advisory Committee Comment (1989).

*Spreigl evidence is inherently less reliable than evidence of a prior conviction.* *Spreigl* incidents can involve unsubstantiated, uncharged allegations of prior misconduct, and that misconduct can consist of conduct which would not even be a crime if charged! *Spreigl* incidents routinely are not investigated and documented contemporaneously with their occurrence, such as here. On the other hand, prior convictions, by definition, rest on certified court documents, are accompanied by verbatim transcripts and judge's notes of the proceedings. Moreover, a conviction means that a judge with jurisdiction entered an official pronouncement on an official record that proof beyond a reasonable doubt of a crime had been found by a judge or a jury. Despite the virtual impossibility of doctoring, altering, or impeaching certified court records, we have imposed a general 10–year limit on the admissibility of prior convictions for impeachment purposes due to the staleness and the decreased value of such evidence after 10 years. Yet, we allow *Spreigl* evidence to haunt persons all their lives. If logic prevailed, evidence of properly certified past convictions would be allowed in for impeachment purposes *ad infinitum,* but we would limit to 10 years or less evidence of past misconduct by a *Spreigl.* Instead, we do it the reverse way with no justification.

Since we have deemed it necessary to establish a bright-line rule for the use of certified prior convictions to safeguard a person's right to a trial unfettered by unfair bias, it seems a certainty that a similar bright-line rule for *Spreigl* evidence would enhance the quality of justice.

It is not in dispute, even by those that offer *Spreigl* evidence, that a lengthy passage of time between the *Spreigl* incident and the subsequent criminal conduct weakens the probative (but not the prejudicial) value of the *Spreigl* evidence. *See Casady,* 392 N.W.2d at 633.

In the majority opinion where the trial judge is quoted verbatim, the trial judge corroborates my observations about the

---

**3.** Rule 609(b) provides:

Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect. However, evidence of a conviction more than 10 years old as calculated herein, is not admissible unless the proponent gives to the adverse party sufficient advance written notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence.

troublesome aspect of the lapse of time. I suggest that if this trial judge had not found appellate cases allowing in *Spreigl* evidence over 10 years old, that on her own she would have found it more prejudicial than probative and felt justified in suppressing it. The time has come to curtail *Spreigl* evidence to contemporaneous incidents that are truly proven by clear and convincing evidence and that truly conform to the rationale for their limited use set out in *Spreigl* and *Billstrom*, 276 Minn. 174, 149 N.W.2d 281 (1967).

I dissent and would remand this case for trial without the *Spreigl* evidence at issue.