HORACE R. FREEMAN, SPECIAL ADMINISTRATOR OF ESTATE OF WILLIAM D. FLETCHER, v. HENRY MATSON AND ANOTHER.[1]

February 17, 1950.

No. 35,018.

[1]Reported in 41 N. W. (2d) 249.

262

 

*Freeman, King, Larson & Peterson,* for appellants.
*Irving H. Green,* for respondent.

KNUTSON, JUSTICE.

This is an action by the special administrator of the estate of William D. Fletcher, deceased, to recover damages for wrongful death alleged to have been caused by the negligence of defendant Hall M. Matson in the operation of an automobile owned by defendant Henry Matson, which collided with one driven by Fletcher. Plaintiff recovered a verdict, and this appeal is from an order denying an alternative motion for judgment or a new trial.

On September 14, 1946, at about 12:15 a. m., William D. Fletcher was driving his automobile west on Forty-second street in the city of Minneapolis. Portland avenue runs north and south and intersects Forty-second street at approximately right angles. When Fletcher approached Portland avenue, he came to a complete stop at the stop sign east thereof. He then proceeded slowly into the intersection, and when about one-half or two-thirds of the way across he was struck by an automobile being driven in a northerly direction without lights and at a rate of speed of about 50 to 60 miles per hour. Defendants' automobile, driven by Hall M. Matson, came over to the left side of the street, struck the Fletcher car on the left front, glanced off the front of it, and proceeded for about 150 feet before it came to a stop. Hall was drunk at the time. The court instructed the jury that Hall was guilty of negligence as a matter of law, and he does not question that instruction.

Fletcher suffered no visible bruises, lacerations, or other outward signs of physical injury. The testimony shows that he was

pale, his speech incoherent, that he exhibited nervousness and was confused, and that he was perspiring, although it was a cool evening. He was seen rubbing his left arm. He stayed in the car until a truck came for it, and then went home. He seemed to be exhausted and could not sleep. He asked his wife to rub his arm.

Prior to the accident, Fletcher had exhibited good health. He worked daily as a salesman, was interested in sports such as golf, and made no complaints about any ailments. After the accident, he had 12 to 15 spells in which he perspired and was shaky. He had difficulty sleeping and breathing. He gave up all sports, and, while he returned to work, he had his son drive his car for him. He died on October 24, 1946.

There is no dispute on the part of anyone that Fletcher died from coronary sclerosis or a thrombosis. The condition of his heart as disclosed by the autopsy is best described by the doctor who took part in the autopsy, as follows:

"The heart weighs 400 grams. It has a thinned-out right ventricle wall. The left myocardium is thicker; it has a fibrosis of its wall. At some points the wall of the ventricle is only one millimeter thick. The right coronary is almost completely closed in spots by sclerosis, whereas the left-hand anterior descending is 75 per cent closed by sclerosis. No thrombi are found in the coronaries. There is a mural thrombus present at the apex of the left ventricle. The root of the aorta shows a moderate sclerosis. The mitral valve has a thickened nodular border."

It is the contention of plaintiff that the shock incident to the accident brought about injuries to Fletcher's heart which aggravated the existing condition of his heart and was the exciting or immediate cause of death. Defendants contend that decedent's heart was in such condition that he would have died irrespective of the accident and that, at best, the opinions of the doctors are so speculative and conjectural that a verdict based thereon cannot stand.

The court refused to submit the contributory negligence of Fletcher to the jury. The questions presented for our determination are:

(1) Was it error to refuse to submit to the jury the question of the contributory negligence of decedent?

(2) Does the evidence sustain the verdict that the death was caused or contributed to by the accident?

■ We need waste no time on the question of contributory negligence. The decedent did all that he was required to do. He came to a complete stop. Thereafter, he proceeded cautiously through the intersection and was struck when more than halfway through by an automobile being driven without lights at midnight by a drunken driver, obviously trying to scoot in front of the Fletcher car at a high rate of speed. We have no difficulty in holding that the court was correct in refusing to submit the question of contributory negligence to the jury.

■ The next question is more troublesome. Three reputable doctors, two of whom have specialized in heart diseases, testified that in their opinion the accident brought about shock, which in turn caused injuries to the heart, leading progressively to a weakened condition of the heart, which brought about death. Dr. Robert B. Potter explained his opinion thus:

"He had essentially negative past history; he had had no attacks that we could find in his history. Suddenly he has a severe shock. That shock, as you just mentioned, is sufficient to bring on an angina attack and the angina attack cuts down the circulation to the heart and damages the heart. Therefore, the next time it will take less exertion or excitement to bring pain in or damage to the heart. Therefore he was nervous after the accident, which evidenced a decreased circulation. This brought on more heart damage, progressively weakened and damaged the heart muscle, until finally the coronary plugged up completely, in other words, sufficiently to give him an infarct in the heart muscle."

As to whether decedent would have died had he not been in the accident, Dr. Potter testified as follows:

"Q. Having in mind the extent of this man's two coronaries— and there are only two?

"A. Yes.

"Q. —were obstructed by sclerosis, isn't it a fact that he couldn't possibly have gotten along without many, many attacks of angina before this accident ever happened?

"A. Not possibly because he did get along.

"Q. Do you believe that a man can have his coronaries obstructed to the extent that his two were and not have angina attacks long before the accident happened?

"A. I don't see how he could stand much exertion, but we do see some terribly closed and they still get around without any trouble."

Dr. Reuben Berman had this explanation of his opinion:

"It is my opinion that this man was suffering from coronary sclerosis, that at the time of the accident or shortly thereafter he suffered shock, traumatic shock, shock following the accident, that in this shock he had a fallen blood pressure, which is a common occurrence in shock and which is evidenced by pallor and perspiration, that in the period in which his blood pressure had fallen, in which he was suffering shock, the circulation to his coronaries, the circulation to the heart and coronaries was less than usual, that during this period the heart muscle was not receiving enough oxygen, that some of the fibers of the heart died, that subsequently his circulation never returned to the status which this man had prior to the accident, that because of the insufficient power of the cardiac muscle he now shows signs of heart failure, that because of his heart failure he is unable to supply his own heart muscle with sufficient blood to maintain his oxygenation and hence he has recurrent attacks of angina pectoris, and further, because of his heart failure plus his coronary sclerosis terminally he suffers

a myocardinal [myocardial] infarct, which is the final cause of death."

His opinion was that death resulted from the damage done to the heart muscle at the time of the accident. In this respect he testified as follows:

"A. Angina attacks are caused by an insufficient amount of oxygen to the heart muscle, usually not enough to cause death but just insufficient momentarily, when a certain percentage of the heart wall is diseased. Heart failure results then and angina will occur, because you are not getting a sufficient amount of blood to the heart muscle to maintain it, when there is a little more exertion required of the heart.

"Q. And every time you have an angina attack, does that damage the heart again?

"Mr. Freeman: That is objected to as leading.

"The Court: Overruled.

"A. It is the other way around. I don't believe you usually get a damaged muscle from the momentary attacks of pain.

"Q. But the ultimate death, in your opinion, came about from the damage to the heart muscle on September 14, 1946?

"A. Yes.

"Q. And if the heart muscle had not been damaged by that traumatic shock, so far as whatever is shown in this case is concerned, could that man have continued to live for years and years?

"A. Yes, he could."

Dr. David L. Fingerman explained his opinion thus:

"Q. * * *. what is the basis for your opinion?

"A. Well, there are several things to take into account in this case. In retrospect, working from the autopsy findings and going backwards, first of all we find in the autopsy report that the man had definite evidence of heart failure, in addition to coronary disease and a myocardial infarct. He had what we call heart failure cells in the lungs, as described by the pathologist at the autopsy. He had congestion in the liver and he had what the pathologist would

say were findings of right sided and.left sided heart failure. The shortness of breath, especially at night, also bears out this particular fact, that the man did show signs of heart failure, that his heart wasn't able to push the blood fast enough through the lungs so that he became dyspneic or short of breath. Those findings and symptoms we know were present.

"We also know that at the autopsy he had coronary sclerosis. There were no symptoms of this sclerosis prior to the accident; there were no symptoms or complaints of heart failure prior to the accident. Immediately after the accident he shows these symptoms of heart failure. Again, we know that he had some previous condition in his heart, that it probably was not completely normal but was carrying on for average daily activities which he was doing before the accident.

"Now, with the fear and excitement of any accident, and emotional shock which may have been prolonged, we have a very marked influence on the heart. Everyone is aware of the increase in rate of heart beat, the heart works much harder, and the heart is doing as much work during an exciting or an emotional situation as it would be if a man had undergone tremendous exercise or extreme work. With this increase of the heart rate and the abnormal situation which has developed, this was too much of a load on the heart, and the heart which ordinarily can carry on for daily activities, was not able to continue functioning and began to fail and there was heart failure, as shown by signs of shortness of breath and shown by the autopsy findings, and this came shortly after the accident.

"There is a direct relationship. And also we have evidence of heart failure as based on pain. The pain is an evidence of lack of oxygen to the heart muscle. The pain known as angina pectoris can be brought on by not only a decreased amount of blood going to the heart but also by an increased demand of the heart muscle by the same amount of blood. If that blood is going at the same pace or even diminished, which it does do during excitement, may have diminished blood through the coronaries because of the increased

heart rate, the pain comes on and also contributes to the heart failure.

"He may or may not have had a coronary thrombus at the time of the accident. The pathologist testified to the fact that he did have thrombus occurring about 25 days, approximately, or 30 days before death; it is difficult to estimate the exact time of the formation of a thrombus. However, this pain indicated coronary insufficiency, which also is extremely common in bringing on heart failure, in addition to the fact that he had some previous damage to the heart, which was more susceptible to heart failure, but was sufficient to give him enough to carry on daily activities.

"Q. Now, Doctor, what is this coronary thrombus, what is that?

"A. A coronary thrombus is a plug in the coronary arteries, of blood ordinarily, it is a blood clot which forms in the coronary artery.

"Q. Could that be brought about by an event like this accident of September 14th?

"A. The coronary thrombus, in itself, it is difficult to say that the accident caused that. No one can argue that point, I don't think, to any great degree. I think it is more accurate to say that heart failure can come on by excitement and then one may have a coronary thrombus, which did occur in this case.

"Q. In other words, thrombus comes after heart failure?

"A. I think you can give more factual evidence of that."

Dr. Ragnvald S. Ylvisaker and Dr. Jay C. Davis, both of whom had specialized in internal medicine, including heart diseases, were of the opposite opinion. They testified for defendants. Dr. Ylvisaker explained his opinion in the following manner:

"Q. What is your opinion, Doctor?

"A. In my opinion that accident had nothing to do with that man's death.

"Q. What are your reasons for saying that?

"A. This case, in my opinion, illustrates the typical progress of events in any case of coronary arteriosclerosis. In other words, this is an aging process. Some people come to it earlier and some later.

Unfortunately, this man came to it earlier, at the age of 43. As to coronary arteriosclerosis, the gradual narrowing or limitation of the opening in those coronary arteries, various things may produce pain, pain from this narrowing, such as excitement, nervousness, increased effort, even eating a meal sometimes may produce pain. So that we find those things in the normal course of events in this case. As the sclerosis progresses and that opening gets smaller and smaller, it will take less and less to bring about pain, this pain, of course, being due to lack of nutrition, as I said before, and lack of oxygen in the heart muscle; and finally even very slight excitement, even walking a short distance, as in this case, will bring about pain.

"Finally, this narrowing may become so intense that we may get an acute infarction or death of the heart muscle, simply from lack of nutrition, and this is frequently the cause of death in those cases."

Dr. Davis testified as follows:

"A. I think his death was due to myocardial infarction as the result of a marked sclerosis of the coronary arteries, with a resulting insufficient blood supply to the heart muscle, with the result that infarction occurred, which in turn resulting in the heart finally stopping and heart failure in the lungs terminally.

"Q. Having in mind the incident referred to, the accident that was included in the question, I will ask you, do you have an opinion as to whether or not that accident had anything to do with this man's death?

"A. I don't think so.

"The Court: Have you an opinion?

"Witness: Yes, I have.

"Q. What is that opinion?

"A. That it did not."

All the doctors agree that the coronary sclerosis or thrombus which the autopsy disclosed could have caused death without the accident. The opinion of plaintiff's doctors was that it did not do so. Defendants contend that upon such a record the evidence at

best does not preponderate in favor of plaintiff and that as a matter of law the medical testimony is insufficient to sustain the verdict.

Defendants rest heavily on Currie v. General A. F. & L. Assur. Corp. Ltd. 241 Wis. 564, 6 N. W. (2d) 697. The facts in that case are somewhat similar to those before us. Bernard Winn was a passenger in an automobile which was struck by an automobile insured by defendant. After the accident, Winn had no apparent injuries and went to work as usual on the day of the accident. He died about 14 days after the accident. The plaintiff claimed that his death was caused by shock occasioned by the collision. The evidence showed that Winn had had a bad heart condition for six years prior to the accident. Medical testimony differed as to the cause of death, some doctors asserting that they believed it was due to the heart condition and others testifying that under the facts as stated it might have been due to shock. Some lay witnesses testified that Winn was changed considerably after the accident, having pain, loss of appetite, and inability to sleep well, and that he showed greater irritation. Winn did have a cold after the accident. The jury found that the accident resulted in injuries which contributed to the cause of Winn's death and assessed damages against the defendant. As here, the claim of defendant was that the verdict was not sustained by the evidence. The appellate court of Wisconsin, in reversing, said (241 Wis. 566; 6 N. W. [2d] 698):

"With the facts, a diseased heart combined with a cold, so thoroughly established, the respondent's claim cannot in justice be granted. It is not enough to say that the collision might have been a cause of death. The collision was not serious. Winn was not disturbed so far as reporting for duty, and his affliction supplemented by a cold is an explanation of the difference in conduct described by his associates. All the symptoms which he displayed subsequent to June 29th would readily and naturally be caused by his heart condition and the cold as well as by shock occasioned by the accident. The only way in which Winn's death can be said to be connected with the collision is by opinions of doctors who did not see Winn

while he was alive. The most they could do was speculate as to what was likely to happen under certain hypothetical conditions, and in the questions put to the experts called by respondent the factor of a cold was not included."

The distinguishable facts in the Currie case are that there were no outward indications of the shock or injuries at the time of the accident. The court's decision is based in part on the fact that the diseased heart, combined with a cold, was instrumental in producing death. Here, there were many indications of shock which at the time of the accident may have injured decedent's heart. The opinions of the doctors who testified for plaintiff were that such shock began the fatal injury to the heart, which thereafter became progressively worse until death resulted. Even though defendants' doctors disagree, we cannot say that the opinion of plaintiff's doctors is based so far on conjecture or speculation that we should substitute our opinion for theirs. In the field of medical science, it is apparent that there will be a difference of opinion. Where the opinions of reputable doctors have a reasonable basis on the facts, it must be left to the trier of facts to say who is right when other doctors have conflicting opinions.

Defendants also contend that the doctors who testified for them were older and more experienced than those who testified for plaintiff; that on this account the opinions of defendants' doctors are entitled to greater weight; and consequently that the evidence preponderates in defendants' favor. While it is true that age and experience are matters that should be considered by the trier of fact, the credibility of the witnesses and the weight to be given their testimony, whether it be opinion evidence or otherwise, is for the trier of fact. We are not prepared to say that the opinion of older doctors must necessarily be given more weight than younger ones.

We have carefully examined all other cases cited by defendants, but see no reason for attempting to distinguish them here. We do not believe that they are controlling over the facts in this case. In the light of all the evidence in this case, we are of the opinion that it was proper for the jury to determine whether the accident was a

contributing or the exciting cause of the death of William D. Fletcher.

Affirmed.

[1]Reported in 41 N. W. (2d) 451.