**STATE of Minnesota, Respondent,**

v.

**Elmo Macksie CURRIE, Appellant.**

**No. C5–86–766.**

Court of Appeals of Minnesota.

Feb. 10, 1987.

Review Denied April 17, 1987.

Hubert H. Humphrey, III, Atty. Gen., Thomas L. Johnson, Hennepin Co. Atty., Vernon E. Bergstrom, Chief, Appellate Section, Minneapolis, for respondent.

C. Paul Jones, State Public Defender, Cathryn Y. Middlebrook, Asst. Public Defender, Minneapolis, for appellant.

Considered and decided by POPOVICH, C.J., and PARKER and LESLIE, JJ., with oral argument waived.

## OPINION

PARKER, Judge.

Elmo Currie appeals from convictions on two counts of first-degree assault, contending that (1) the "great bodily harm" element of first-degree assault is unconstitutionally vague as applied to the facts of this case; (2) there was insufficient evidence of great bodily harm; (3) the trial court erred by refusing to define the word "serious" in the jury instructions; and (4) *Spreigl* evidence was improperly admitted. Currie also raises several *pro se* claims. We affirm.

## FACTS

Currie was charged with two counts of first-degree assault, Minn.Stat. § 609.221 (1984). The complaint alleged that on March 15, 1984, Currie whipped his two children, 14–year–old K.C. and 13–year–old E.C., with an extension cord. At trial K.C. described the reasons for the beating:

> Because, see, we were going shopping and we had these food stamps, and my dad wanted us to get change. So we would go and buy like little pieces of candy, see. And I seen my sister at the cash register, so I gave her the candy, see, and I didn't get, you know, any change. So I had to go do it again and he got mad at me. And, see, there was another reason, and that's because we let our uncle in the house the day after and the day before.

When they arrived home, Currie retrieved an extension cord, called E.C. into the back room, and whipped her for several minutes. E.C. said Currie hit her about 15 times with the extension cord. K.C. saw blood on E.C.'s clothes when she came out.

Currie then called K.C. into the room and hit him on the back with the extension cord 15 or 20 times. K.C. said his beating lasted about a minute. Afterward, their mother took K.C. and E.C. into the bathroom and put cold towels on their backs. K.C. said his sister's back was bleeding and "had big welts on it and like marks and scabs." Both children testified that their backs hurt for over a week and that they still carry scars from the beating. When asked how he felt about his scars, K.C. said, "[w]ell I can't take my shirt off in front of nobody or go swimming or nothing like that."

Several photographs which show numerous scars on the children's backs were admitted into evidence.

The children's mother also testified that Currie had whipped K.C. and E.C. with an extension cord. She heard the children crying, but did not try to stop Currie because she was afraid he would hit her. Currie would not let her take the children to a doctor and told her "he had a right to do whatever he wanted to with them because

they were his children." The mother said she was afraid of Currie during their entire marriage, and she told her children not to tell anyone about the beatings so they wouldn't get any more.

## Spreigl Evidence

Over defense objection and after a cautionary instruction to the jury, the mother described three other incidents of violence in the family. In March 1983 and June 1984 Currie threatened her and the children with a gun. The mother filed for protective orders, but later dropped the proceedings and returned to Currie because she was afraid of him. The last incident occurred in spring 1985, when Currie punched the mother, threw her against a wall and told her to "go out and make him some money." As a result, she left Currie and the children and went to a home for battered women.

K.C. described a fourth incident that occured in June 1985. He was at his aunt's house when Currie drove up. They discussed an upcoming trial in juvenile court; then Currie told K.C. that if he testified, "he would cut [K.C.'s] throat."

## Medical Evidence

In April 1984 Dr. Johanna Miller, a pediatrician at the Pilot City Health Center, gave E.C. a routine scoliosis check and observed several scars on E.C.:

E.C. had multiple scars on her back, lines going across from the left shoulder downward, and then little loop-like marks across the lower lefthand side—or righthand side of her back.

Dr. Miller also examined E.C. shortly before trial and stated that, in her opinion, E.C.'s scars were "life-long."

Dr. Eric Stull, also a pediatrician at Pilot City Health Center, treated K.C. on August 22, 1984, for a cough. Dr. Stull observed numerous "lighter colored linear marks" and "loop-type injuries, which are usually indicative of being struck with a cord of some sort." Dr. Stull stated that K.C. was "quite disfigured on his back:"

He has a number of large scars that are raised that would attract your atten-

tion if you saw him without a shirt on. I think it's sufficient that it would be very difficult for him to go someplace where he would be undressed, the beach, wearing shorts without a shirt, taking a shower in a gym, without someone from a distance noticing that there was something very striking about his injuries.

Dr. Stull said there would not be any significant future changes in the scarring.

Dr. James Savoral, a pediatrician at Hennepin County Medical Center, examined E.C. both shortly before and during the trial and stated that her scars would last "for a long time, probably for a lifetime." In Dr. Savoral's opinion the scarring "could have been less" had the injuries been treated at the time they were inflicted.

Currie testified that he has never been arrested or convicted of any crime and that he was a correctional officer for several years before being fired. He denied beating his children and said he was not responsible for their scars. He denied all the incidents of violence and said he never threatened K.C. Currie denied that he had lived with his wife and children.

On cross-examination the prosecutor asked Currie about the scars on his children's backs:

Q: Have you seen the scars on your children's backs?

A: Prior to now?

Q: Have you ever seen their scars?

A: I seen them maybe two or three months before I got arrested.

Q: What did you think about those? Did you think they were pretty serious injuries?

A: Yes. We got into a conversation about it.

Q: Didn't you wonder who did them if you didn't?

A: Yes I did.

Q: Did you try to find out?

A: I asked her and I asked the kids, and we kind of got into an argument about it.

Q: What is your theory about who did this to your children?

A: Well, she threatened to have me locked up, so I left it alone.

Q: No, I said, what's your theory about who did this to your children?

A: Her, her sister, or whoever was keeping them. At that time, the kids were spending a lot of time with her people and her.

The jury found Currie guilty on both counts. The trial court sentenced him to prison for concurrent terms of 43 and 54 months.

## ISSUES

1. Is the "great bodily harm" element of first-degree assault unconstitutionally vague as applied to these facts?

2. Was the evidence sufficient?

3. Did the trial court properly instruct the jury?

4. Did the trial court abuse its discretion by admitting evidence of Currie's other assaultive acts?

## DISCUSSION

### I

Currie was convicted of two counts of first-degree assault, which is defined as assault with infliction of "great bodily harm." Minn.Stat. § 609.221 (1984). The phrase "great bodily harm" is further defined as

bodily injury which creates a high probability of death, *or which causes serious permanent disfigurement,* or which causes a permanent or protracted loss or impairment of the function of any bodily member or organ *or other serious bodily harm.*

Minn.Stat. § 609.02, subd. 8 (1984) (emphasis added). Currie's argument focuses on the word "serious," which he contends is unconstitutionally vague as applied to the facts of this case.

Under the void-for-vagueness doctrine, a criminal statute must define the offense "with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983). In discussing the void-for-vagueness doctrine in a recent case, this court stated:

A statute which provides the basis of a criminal prosecution must meet due process standards of definiteness under both the Minnesota and United States Constitutions. A statute is void for vagueness if persons of common intelligence must necessarily guess at its meaning or differ as to its application. The purpose of the void-for-vagueness doctrine is to put ordinary people on notice of what conduct is prohibited and, more importantly, to discourage arbitrary and discriminatory law enforcement.

*State v. Kager,* 382 N.W.2d 287, 289 (Minn. Ct.App.1986), *pet. for rev. denied,* (Minn. April 18, 1986) (citations omitted). A vagueness challenge must be examined in light of the defendant's actual conduct. *Id.* (citing *State v. Becker,* 351 N.W.2d 923, 925 (Minn.1984)). Currie must show that the first-degree assault statute "lacks specificity as to his own behavior and not as to some hypothetical situation." *Id.* (citing *Parker v. Levy,* 417 U.S. 733, 755–57, 94 S.Ct. 2547, 2561–62, 41 L.Ed.2d 439 (1974)). Currie has made no such showing.

Both E.C. and K.C. testified that Currie whipped them with an extension cord until their backs were bleeding. The beatings left numerous scars which are still evident almost two years later. Three physicians concluded that E.C. and K.C. will bear those scars for the rest of their lives. One doctor described K.C.'s back as "quite disfigured." At trial Currie stated that he has seen the scars and that they are serious.

■ By statutory definition, one type of "great bodily harm" is "serious permanent disfigurement." Minn.Stat. §§ 609.221 and 609.02, subd. 8 (1984). Under the facts of this case, we conclude that the language of these statutes is sufficiently definite for

Currie to have understood that his conduct was prohibited. *See Kolender*, 461 U.S. at 357, 103 S.Ct. at 1858.

## II

Currie contends he could not be convicted of first-degree assault because there was insufficient evidence that he inflicted "great bodily harm." Minn.Stat. § 609.221 (1984). Currie argues that "serious permanent disfigurement" requires proof of an injury which creates a high probability of death. Minn.Stat. § 609.02, subd. 8 (1984). Currie bases his argument on the doctrine of *ejusdem generis*, which requires that general words "are construed to be restricted in their meaning by preceding particular words." Minn.Stat. § 645.08(3) (1984).

■ We do not find this argument compelling. First, it is not clear that the phrase "serious permanent disfigurement" is less particular than the phrase "bodily injury which creates a high probability of death." Minn.Stat. § 609.02, subd. 8 (1984). We agree with the State that *ejusdem generis* is inapplicable because these two clauses are independent and refer to different types of injuries. Injuries that create a high probability of death need not be particularly disfiguring, nor are all disfiguring injuries necessarily life-threatening.

■ Second, other defendants have been convicted of first-degree assault without inflicting life-threatening injuries. *See State v. Bridgeforth*, 357 N.W.2d 393 (Minn.Ct.App.1984), *pet. for rev. denied* (Minn. Feb. 6, 1985) (finding factual basis for guilty plea where victim lost a tooth); *State v. Jones*, 266 N.W.2d 706 (Minn.1978) (sufficient evidence of "other serious bodily harm" where victim was unconcious for one day and hospitalized for one week); *compare State v. Stafford*, 340 N.W.2d 669, 670 (Minn.1983) (supreme court stated in dicta that "[a]rguably, 'great bodily harm' is inflicted if one knocks someone out briefly").

■ Finally, it is undisputed that both children have numerous, permanent scars. *See State v. Anderson*, 370 N.W.2d 703, 706 (Minn.Ct.App.1985), *pet. for rev. denied* (Minn. Sept. 19, 1985) (single surgical scar constituted "serious permanent disfigurement"). The jury heard the testimony of the witnesses and found that Currie inflicted serious bodily harm on his children. We have examined the record and conclude that it supports the verdicts. *State v. Merrill*, 274 N.W.2d 99, 111 (Minn. 1978).

## III

Defense counsel asked the trial court to include this definition of the word "serious" in the jury instructions:

> In order for any injury to be 'serious', it must have threatened loss of life or of the function of any part of the body.

The trial court denied the request and used the standard jury instructions for first-degree assault. *See* Minnesota District Judges Association, 10 Minnesota Practice, CRIMJIGS 13.03 and 13.04. Currie contends this was error. We disagree.

■ The trial court adequately instructed the jury on the statutory definition of first-degree assault and explained the elements of the offense, including "great bodily harm." *See Rosillo v. State*, 278 N.W.2d 747, 749 (Minn.1979); *State v. Peterson*, 375 N.W.2d 93, 96 (Minn.Ct.App. 1985). The trial court acted within its discretion when it denied Currie's requested instruction, because "serious" is a word of common usage:

> Detailed definitions need not be given in jury instructions if the instructions do not mislead the jury or allow it to speculate over the meaning of the elements. Words of common usage within the ordinary understanding of a juror need not be defined by the court.

*State v. Heinzer*, 347 N.W.2d 535, 537 (Minn.Ct.App.1984), *pet. for rev. denied*, (Minn. July 26, 1984) (citations omitted) (holding that "resist" is a common word). Further, the trial court provided written

copies of the instructions to each juror. We find no error.

## IV

■ Currie's contention that evidence of his prior acts of violence toward members of his family was inadmissible lacks merit. Such evidence may be admitted for the purpose of illuminating the relationship between defendant and victim and placing the incident with which the defendant is charged in proper context. *See State v. Waukazo,* 374 N.W.2d 563, 565 (Minn.Ct. App.1985), *pet. for rev. denied* (Minn. Nov. 1, 1985) (*citing State v. Volstad,* 287 N.W.2d 660, 662 (Minn.1980)); *see also State v. Spreigl,* 272 Minn. 488, 491, 139 N.W.2d 167, 169 (1965). The four incidents showed the relationship that existed between Currie, his former wife and their children. We find no abuse of discretion in the trial court's admission of this evidence. *See State v. Ture,* 353 N.W.2d 502 (Minn. 1984).

## V

■ Currie filed several *pro se* motions with the trial court and raised similar claims on appeal in his supplemental brief. To the extent that these unfocused, rambling dissertations are comprehensible, they are without substantial merit.

## DECISION

The first-degree assault statute is not unconstitutionally vague as applied to appellant's conduct; the evidence was sufficient to support the verdicts; the trial court did not err in instructing the jury; and *Spreigl* evidence was admissible to show the relationship between appellant and the victims.

Affirmed.