STATE of Minnesota, Respondent,

v.

Janet Marie OSTLUND, Appellant.

No. C5–87–390.

Court of Appeals of Minnesota.

Dec. 15, 1987.
Review Denied Feb. 24, 1988.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Thomas L. Johnson, Hennepin Co. Atty., Vernon E. Bergstrom, Chief, Appellate Section, J. Michael Richardson, Asst. Co. Atty., Minneapolis, for respondent.

Ronald I. Meshbesher, Steven J. Meshbesher, John P. Sheehy, Meshbesher, Singer & Spence Ltd., Minneapolis, for appellant.

Heard, considered and decided by WOZNIAK, P.J., and FOLEY and CRIPPEN, JJ.

## OPINION

FOLEY, Judge.

Appellant Janet Marie Ostlund was charged by complaint[1] with second degree murder in the unintentional killing of her infant daughter Maria by shaking her and causing massive injury to her brain. After a jury trial, appellant was convicted. The trial court denied defense motions for a judgment of acquittal at the close of the state's case and after the verdict. The trial court also denied appellant's motion for a new trial. We affirm.

### FACTS

Appellant married David Ostlund in January 1983. The couple wanted to have children but experienced problems of infer-

tility. They decided to adopt a child in the fall of 1983.

Hope International approved them for adoption. In August 1985, appellant and her husband flew to Miami to pick up the child whom they had already named Maria Catherine. Maria was 15 months old and had been born in El Salvador. She had several health problems when she arrived. She was underweight and malnourished, had badly infected ears, and scabies. She could barely sit up or crawl. Appellant took her to Dr. Mace Goldfarb, a pediatrician, who detected a heart murmur, and informed appellant that Maria was developmentally delayed and possibly mentally retarded.

On July 14, 1986, appellant and her husband had a quarrel about doing work in the yard and around the house. David left the house at approximately 6:30 p.m. to go to a friend's house. David's children by a previous marriage also left the house at about 7:00. Appellant was alone with Maria. Appellant claims that she was watering plants in the living room, and Maria had climbed up on the couch to look at some little figurines that were on a shelf on the wall.

Appellant claims that she had her back turned and then heard a thump, and when she turned around she saw Maria lying face up on the kitchen linoleum near the couch. Maria was not moving. Appellant took her to North Memorial Hospital, arriving at approximately 7:19. Maria had suffered a severe brain injury. She was transfered to Minneapolis Children's Hospital, where she died at about 6:00 p.m. on July 15 of closed head trauma due to swelling of the brain with the presence of subdural bleeding on the brain.

### ISSUES

1. Is the state's evidence sufficient to sustain the conviction of second degree murder?

1. Appellant had been indicted by a grand jury on the same offense, but the indictment was dismissed on procedural grounds. The county attorney then filed a complaint charging appellant with second degree murder.

2. Did the prosecutor commit prejudicial misconduct?

3. Did the trial court err by ordering defense counsel to refrain from commenting in closing about the state's failure to produce a witness?

4. Did the trial court err in admitting *Spreigl* evidence?

5. Did the trial court err by failing to instruct the jury on the lesser included offense of first degree manslaughter?

6. Should a new trial be granted in the interests of justice?

### ANALYSIS

1. *Sufficiency of the Evidence*

The state's theory, based primarily on circumstantial evidence including medical opinion testimony, was that Maria's injuries were caused by a violent shaking. A conviction may be based on circumstantial evidence and will be upheld if the reasonable inferences from such evidence are consistent only with the defendant's guilt and inconsistent with any rational hypothesis except that of guilt. *State v. Anderson,* 379 N.W.2d 70, 75 (Minn.1986), *cert. denied,* 476 U.S. 1141, 106 S.Ct. 2248, 90 L.Ed.2d 694 (1986). The court will examine the evidence by viewing it in the light most favorable to the verdict and will assume that the jury disbelieved any testimony in conflict with the result it reached. *State v. Daniels,* 361 N.W.2d 819, 826 (Minn.1985).

Appellant argues that the state's experts' medical opinions are insufficient as a matter of law to prove beyond a reasonable doubt that Maria's death was a homicide. The state called six medical experts to testify about the cause of Maria's injuries. Dr. Goldfarb, Maria's pediatrician and the attending physician when Maria was brought in to the Children's Hospital on July 14, testified:

Q. [By the prosecutor] Doctor, based on your training and experience and your examination on July 14th and 15th of Maria Ostlund, do you have an opinion to a reasonable medical certainty whether the injuries that you saw in Maria Ostlund could have been sustained as de-

scribed by Janet Ostlund in a fall from a couch that has a back which at it's highest point is 32 inches high?

A. I believe that the findings were inconsistent with that kind of fall.

Q. * * * do you have an opinion as to whether the injuries Maria suffered on July 14th of 1986 were consistent with a child who had been shaken?

A. I think the injuries were consistent with that, yes, I do, with the shaking.

Dr. Lindsey Thomas, deputy medical examiner at the Hennepin County Medical Examiner's office who performed an autopsy on Maria, testified:

Q. [By the prosecutor] * * * do you have an opinion as to the cause of Maria Ostlund's death?

\* \* \* \* \* \*

A. The cause of death was the brain swelling and subdural bleeding due to a closed head injury, and specifically, the type of closed head injury that I believe caused these injuries was a shaking or whiplash type of injury.

\* \* \* \* \* \*

Q. * * * do you have an opinion to a reasonable medical certainty as to whether Maria Ostlund suffered these injuries in a fall from a couch, the highest point of which is 32 inches?

\* \* \* \* \* \*

A. * * * [I]t is inconceivable that these injuries could have occurred from a fall off a couch.

Q. Why is that?

A. My experience has been and studies have shown that children that fall from height such as a couch in a home do not sustain significant brain injuries.

In rebuttal, Dr. John MacDonald, a pediatric neurologist who participated in Maria's care on July 15th, testified:

Q. [By the prosecutor] Do you have an opinion, to a reasonable medical certainty, as to whether Maria Ostlund suffered that injury from a fall off a couch, the highest point of which is 32 inches?

A. I would have a very hard time accepting that degree of injury from that type of fall.

Q. * * * do you have an opinion, to a reasonable medical certainty, as to the mechanism that resulted in her injuries?

A. From the facts that I have and the exam I did, I would have to conclude that the most likely primary diagnosis would be a shaken baby syndrome.

In rebuttal, Dr. David Dassenko, a pediatric intensive care physician who participated in Maria's care on July 15, testified:

Q. [By the prosecutor] Do you have an opinion, to a reasonable medical certainty, as to whether the injury that Maria Ostlund had and you were treating her for, occurred from a fall onto a linoleum floor from a couch of which the highest point is 32 inches?

A. * * * well, I've never seen, I should say, a fatal head injury from that type of thing, in my experience.

In rebuttal, Dr. Richard Fox, director of pulmonary and critical care services at Minneapolis Children's Hospital who treated Maria on July 14, testified:

Q. [By the prosecutor] * * * Do you have an opinion, to a reasonable medical certainty, of whether a fall from a couch onto a linoleum surface would produce the brain injury that Maria Ostlund had?

A. Well, I find it almost unbelievable.

The state's last medical expert, Dr. Garry Peterson, Hennepin County Medical Examiner, testified in rebuttal:

Q. [By the prosecutor] Do you have an opinion as to, not how, but what caused that brain injury?

* * * * * *

A. The explanation that I reached was that there was a shaking that caused commotion to the head, tearing the bridging veins and a collection of subdural hemmorrhage and injury to the brain that caused the swelling and set the process in motion.

The defense also called six medical experts to testify about the cause of Maria's injuries. Dr. William Rodman, an ophthalmologist who examined Maria's eyes on July 15, testified:

Q. [By Mr. Meshbesher] Did you do a complete exam of Maria's eyes?

A. * * * yes.

Q. What do you feel was the significant finding in Maria?

A. I think the significant finding was that the retina wasn't being profused, * * * the retina was totally without blood when I saw it, so that my assumption was that something had choked off the artery to the retina * * *.

Q. Is what you found caused by shaking?

* * * * * *

A. * * * I can't make the connection between these eye findings and shaking because the literature describes a different appearance than what I saw as being related to shaking.

* * * * * *

A. * * * Shaken infants, the literature describes massive, severe hemorrhages, many of which are large[.]

Q. Did you see those in Maria Ostlund's eyes?

A. This child had small, pinpoint, dot hemorrhages; * * * These are small hemorrhages.

Q. They were not what the literature describes?

A. Correct.

Dr. Angeline Mastri, who specializes in pathology of the nervous system, was asked by Dr. Thomas to examine Maria's brain after the autopsy. She testified:

Q. [By Mr. Meshbesher] Are these findings consistent with the shaking death?

* * * * * *

A. I can't tell from the material that I examined what initiated this, but there was a blow to the back of the head which probably initiated swelling of the brain.

Q. But are these findings consistent with a shaken infant?

A. The subgaleal hemorrhage, I believe, is not consistent with that.

Dr. Robert ten Bensel, a pediatrician and professor at the University of Minnesota, testified:

> Q. [By Mr. Meshbesher] * * * do you have an opinion * * * as to the cause of Maria Ostlund's death on July 15, 1986?
>
>     *     *     *     *     *     *
>
> A. My opinion is that this is an accidental death.
>
> Q. Is this the type of injury that you would see in a child that had been shaken?
>
> A. No, it is not.

Dr. Janice Amatuzio, assistant coroner of Dakota, Scott and Chisago County and director of laboratories at Regina Memorial Hospital, testified:

> Q. [By Mr. Meshbesher] What was the cause of Maria Ostlund's death?
>
> A. The cause of Maria Ostlund's death was herniation of the brain due to acute cerebral edema due to an impact injury from a fall. The manner of her death was accidental.
>
>     *     *     *     *     *     *
>
> Q. Dr. Amatuzio * * * is there any evidence from either the investigation or the autopsy that Maria was shaken, violently shaken to death?
>
> A. There is not evidence for that.

Dr. Gerald Slater, a staff physician and neurologist in pediatrics at Hennepin County Medical Center, testified:

> Q. [By Mr. Meshbesher] Dr. Slater, showing you this photograph of the back of Maria Ostlund's head taken on July 16th of 1986, is that consistent with the findings of a shaken infant.
>
> A. No, sir, it's not. It's consistent with trauma.
>
> Q. What type of trauma?
>
> A. Accidental trauma.
>
> Q. Such as a fall?
>
> A. That's right, such as a fall.

The final defense medical expert was Dr. John Plunkett, coroner for Scott, Dakota and Chisago County, who testified:

> Q. [By Mr. Meshbesher] Is there any evidence from the investigation or autopsy that Maria's injuries and subsequent death was caused by shaking?
>
> A. No, there is not.
>
> Q. Why not?
>
> A. * * * The findings in a child who has been shaken are a specific type of hemorrage or bleeding in the back of the eyes, bilateral subdural hemotomas, no evidence of an impact injury and specific fractures in bones. The type of bleeding in the back of Maria's eyes was not the type of bleeding that you see in a child who has been shaken. Secondly, the subdural hematoma which she has can very easily be explained by the impact injury on the back of her skull. In other words, she hit her head on the floor. And finally, and this isn't always present, but Maria had no evidence of any metaphyseal avulsions or fractures or elevations of that lining membrane of the bone in any of those X-rays that were taken after her death, not those specific kind of fractures. She was not a shaken child.

■ In the field of medical science, it is apparent that there will be a difference of opinion. *Freeman v. Matson,* 230 Minn. 261, 271, 41 N.W.2d 249, 255 (1950).

> Where the opinions of reputable doctors have a reasonable basis on the facts, it must be left to the trier of facts to say who is right when other doctors have conflicting opinions. * * * the credibility of the witnesses and the weight to be given their testimony, whether it be opinion testimony or otherwise, is for the trier of fact.

*Id.*

The sufficiency of the foundation to qualify a witness as an expert and therefore to permit the witness to express an expert opinion is a determination resting largely in the discretion of the trial judge and will not be reversed unless the exercise of that discretion was clearly erroneous. *Kastner v. Wermerskirschen,* 295 Minn. 391, 394, 205 N.W.2d 336, 338 (1973). Here, appellant did not object to the qualifications of any of the state's medical experts.

■ Viewing the medical evidence in the light most favorable to the verdict, the

testimony presented by the state's medical experts provides reasonable inferences that Maria's injuries were caused by shaking and not by a fall from a couch. It is not the function of this court to substitute its judgment for a jury verdict on the weight of conflicting evidence. *Eliason v. Production Credit Association of Aitkin,* 259 Minn. 134, 135, 106 N.W.2d 210, 211 (Minn. 1960).

2. Appellant contends that the prosecutor committed prejudicial misconduct when cross-examining her, in that he made certain assertions, as leading questions, indicating that appellant was telling this version of the facts for the first time:

Q. [By the prosecutor] But wasn't she standing on the cushion?

A. The last time I saw her, no.

Q. She was standing on the top of the backrest where my finger is?

A. Approximately in that area.

Q. This is the first time you said that, isn't it?

A. Said what?

Q. That she was standing on top of the backrest?

A. No.

> \* \* \* \* \* \*

Q. Detective Engbloom quotes you as saying that the last time you saw Maria, she was standing on the sofa cushions.

A. The last time I saw Maria was she was standing on top of the couch.

> \* \* \* \* \* \*

Q. He quotes you, at least in that portion, as saying the last time you saw the child, Maria was standing on the corner of the sofa with her back against the sofa, facing you.

A. I cannot remember what I told him.

Defense counsel did not raise an objection at the time of cross-examination. However, two days later, defense counsel made a motion for mistrial, arguing that the prosecutor's statement was inaccurate and that the declarant, Detective Engbloom, was not presented for cross-examination. The trial court denied this motion without stating any reasons.

Whether a new trial should be granted because of misconduct of the prosecuting attorney is governed by no fixed rules but rests in the discretion of the trial judge, who is in the best position to appraise its effect. *State v. Wahlberg,* 296 N.W.2d 408, 420 (Minn.1980). The court's determination should be reversed on appeal only where the misconduct, viewed in the light of the whole record, appears to be inexcusable and so serious and prejudicial that appellant's right to a fair trial was denied. *Id.*

Appellant had given explanations of the cause of Maria's injuries to Dr. Goldfarb when she brought Maria to the hospital on July 14 and to Engbloom when he interviewed her at the hospital on July 15. Appellant told Dr. Goldfarb that Maria got to the top of the back of the couch and apparently had fallen. Appellant told Engbloom that Maria was standing on the sofa cushions and had been grabbing for some miniatures hanging on the wall behind the sofa.

■ While it is not clear whether this was the first time that appellant said that Maria was actually *standing on the top of the backrest,* we hold that, in light of the entire record, this line of questioning is not so serious and prejudicial as to deny appellant a fair trial. The prosecutor is entitled to reasonable latitude in cross-examination where appellant, testifying on her own behalf, was the only person present when Maria was injured. Here, appellant's credibility was a significant issue.

■ Appellant further asserts that the prosecutor interjected prejudicial hearsay by questioning her about statements she made to Engbloom from his sworn complaint.

In *State v. Stofflet,* 281 N.W.2d 494 (Minn.1979), the prosecutor, in cross-examining a key defense witness, questioned the witness about an inconsistent statement he had made to a deputy sheriff. The state did not call the deputy sheriff, nor was his summary of the witness's statement offered or admitted into evidence. The Minnesota Supreme Court said:

> Whether cross examination concerning a prior inconsistent statement is justified

turns on whether the question is based on evidence or is simply an attempt by the prosecutor to use innuendo.

*Id.* at 497.

Here, the prosecutor's question was based on the statement appellant made to Engbloom, which was contained in his sworn complaint, and was not merely an attempt to use innuendo. Thus, the prosecutor was perfectly justified in cross-examining appellant about this statement. *See Stofflet,* 281 N.W.2d at 497. Furthermore, this statement was introduced for impeachment purposes and not offered to prove the truth of the matter asserted. Thus, it does not constitute hearsay. *See* Minn.R.Evid. 801(c).

■ 3. After both sides rested, the state made a motion to prevent defense counsel from commenting in closing argument about the state's failure to call Engbloom. The trial court stated:

[B]oth attorneys had access to * * * Engbloom. Both attorneys know exactly what * * * Engbloom would say because he testified at the Rasmussen Hearing. Therefore, the Defense attorney cannot argue that the State failed to call * * * Engbloom which would give an inference. That would give an adverse inference to the State.

In *Daniels,* 361 N.W.2d at 819, the defendant argued that the trial court improperly limited his closing argument by not allowing him to comment on the state's failure to call a particular witness. At trial, the state had requested this limitation because the witness was available to both sides to call, and the defense had complete disclosure of all of the state's witnesses. The supreme court upheld that limitation, stating that it was consistent with the general rule that "no adverse inference may be drawn from a party's failure to produce evidence equally available to both sides." *Id.* at 833. We apply that rule here.

In *State v. Sandberg,* 392 N.W.2d 298 (Minn.Ct.App.1986), *aff'm in part and rev'd on other grounds,* 406 N.W.2d 506 (Minn.1987), this court stated that the trial court has the authority to order defense counsel to refrain from commenting on a

prosecutor's failure to call a witness if the witnesses are equally available to both parties. *Id.* at 304. In determining the meaning of "available," the court may focus upon whether defense counsel had complete disclosure of the state's witnesses. *Id.* at 304.

Appellant argues that Engbloom was not truly available to both sides because he was the complaining witness. However, based on the meaning of "available" set out in *Sandberg,* this argument is without merit. Appellant not only had disclosure of this witness and his likely testimony, as Engbloom testified at the Rasmussen hearing, but also submitted Engbloom's name as a potential defense witness at trial. We find no error in the trial court's ruling.

4. Several witnesses testified at trial about certain incidents involving (a) appellant and other children, (b) appellant and Maria, and (c) injuries Maria suffered while in appellant's care.

■ a. Sara Ebaugh testified that in the summer of 1985 she babysat for the appellant's day-care children when appellant went to the doctor. Ebaugh said that when appellant put the children in cribs for naps, she would lean over the crib and drop the children feet first, about eight inches to the mattress. The children would cry, and appellant would just leave the room. Ebaugh also testified that one time there "was a little girl sitting by the stove, just sitting there, and Janet was cooking and she just took [a meatball] out and dropped it down to the girl to eat." The meatball landed on the floor and the little girl ate it. Ebaugh further testified that she never saw appellant feed the smaller children, the ones that could not talk yet. Finally, Ebaugh testified that appellant would sometimes grab the children and pick them up by one arm.

At the *Spreigl* hearing, the state argued that the fact these incidents occurred "demonstrates a callous attitude toward children which is consistent with a person who has demonstrated an application of inappropriate force to kids." The trial court found Ebaugh's testimony to be ad-

missible under an exception to the general rule excluding evidence of prior bad acts because "[i]t does appear to be relevant. There is no question that [appellant] participated in the acts. And it does show absence of mistake or intent and possibly a common plan or scheme." *See State v. Spreigl*, 272 Minn. 488, 491, 139 N.W.2d 167, 169 (1965).

In *State v. Doughman*, 384 N.W.2d 450 (Minn.1986), the supreme court stated that a trial court's admission of evidence of other bad acts will not be reversed unless an abuse of discretion is clearly shown. *Id.* at 454. However, for such evidence to be admissible, the trial court must determine that there is "clear and convincing" evidence that the appellant participated in the bad acts sought to be admitted, that the evidence of prior bad acts is "relevant and material to the state's case," and that the probative value of the evidence outweighs any potential for "unfair prejudice." *Id.* at 454.

The trial court found that the evidence was relevant and that the appellant had clearly participated in the acts. Because appellant contends that Maria's death was an accident, the evidence is probative in that it tends to show an absence of an accident. The trial court did not abuse its discretion in admitting this evidence.

■ b. Sara Wisner, a cousin of David Ostlund, testified that in October of 1985 she saw appellant feed Maria a hot potato. She testified:

Janet opened up the potato and mashed it and went to give it to her and it was too hot. So Maria started crying and Janet said you don't need a potato, forget it, and got upset and walked out of the room.

She also felt that appellant's relationship with Maria did not have the "closeness you would give a baby, the cuddling, kissing, hugging, touching. It was distant."

Laurel Butler, appellant's cousin, testified about an incident when she and her daughter and appellant and Maria were visiting and playing at a friend's house:

There was a soft ball made out of material that we started tossing to the kids and they were tossing them back to us and [appellant] picked the ball up and threw it in, and it went into Maria's face. Maria was startled, didn't cry. Then we continued to throw the ball and she did it again. And this continued and she did it a third time. On the third time I picked the ball up and I said, "Janet, stop throwing the ball in the baby's face." And [appellant] said to me, "Well, I don't want a sissy for a baby."

Butler also testified that on Thanksgiving 1985, she saw appellant spank Maria once on the bottom, but not hard, for eating a cracker. Appellant told Butler that she did not want Maria playing with food.

Diana Nilles, one of Maria's godmothers, testified that she took care of Maria when appellant was in the hospital in September 1985. She brought Maria to the hospital to visit appellant, and "it took a long time before she wanted to hold Maria."

Kathy Hlivka, appellant's sister-in-law, testified that she once saw appellant dish some hot corn casserole onto her plate and give it to Maria. Maria ate some, and then cried. Appellant just sat there, and did not offer Maria a glass of water.

Anna Ostlund, David's daughter from a previous marriage, testified that she saw appellant shake Maria, but not very hard, and that she saw appellant pick Maria up by one arm and carry her from the kitchen to Maria's bedroom.

Lynn Ostlund, David's daughter from a previous marriage, testified that she once saw appellant shake Maria "slightly," and that she saw appellant carry Maria by one arm from the kitchen into the hallway.

Robbie Ostlund, David's son from a previous marriage, testified that he saw appellant shake Maria once, "not very hard or nothing."

The state read Nancy Ebaugh's deposition into evidence. Nancy is appellant's cousin, and she testified that on Christmas day she saw appellant pick up Maria and take her into the bedroom and slap her face, not very hard, and put her down on the floor and shut the bedroom door. She also testified that appellant had called her

and told her that she had given Maria roast beef for lunch and she would not eat it, so then she gave it to her for supper and she would not eat it. And then she gave it to her again for breakfast and she would not eat it, and she gave it to her again for supper and she ate it. "Maria was really hungry, she was starved." Nancy testified that appellant did not actually say that she had not fed Maria any other food during that time, but that she (Nancy) took it that she did not.

Dr. Goldfarb testified that he did not feel that appellant had the same attachment for Maria as other mothers had for their children, "there was not a reaching out on the part of the mother."

The trial court denied appellant's motion to exclude this evidence on the grounds that the state has the right to introduce evidence showing the relationship between appellant and Maria. We find that the trial court did not err in admitting this evidence because such evidence may be admitted for the purpose of illuminating the relationship between appellant and Maria and placing the incident for which appellant is charged in proper context. *See State v. Currie*, 400 N.W.2d 361 (Minn.Ct.App.1987), *pet. for rev. denied* (Minn. April 17, 1987).

■ c. Nilles further testified appellant and Maria came to her parents' furniture store in January or February of 1986, and Maria had a black eye. She also testified that she went to a yard sale at appellant's home and saw Maria with blood on her face and in her mouth. She said that appellant wiped the blood off.

Nancy Johnson, a friend of appellant's, testified that one time appellant had a telephone conversation with her in which appellant expressed concern that Maria had a black eye. Johnson said appellant was worried about the social worker from Hope International because she wanted the adoption to be final.

Finally, Dr. Goldfarb testified that appellant came to his office with Maria in October 1985 because Maria was having trouble crawling. Dr. Goldfarb found that Maria had a fractured arm. Appellant said that

she did not know how the injury had happened.

The dissent argues this testimony should not have been admitted because there was not clear and convincing evidence that these injuries were the result of appellant's conduct. The issue of whether evidence of other acts is clear and convincing is for the court to determine as a matter of admissibility. *State v. Volstad*, 287 N.W.2d 660, 662 (Minn.1980). Admission of such evidence rests in the sound discretion of the trial court and will be upheld absent a clear showing of abuse of discretion. *State v. Ture*, 353 N.W.2d 502, 515 (Minn.1984).

This testimony is admissible circumstantial evidence that Maria had been subjected to abuse and neglect while living with appellant. The fact that these injuries occurred while Maria was in appellant's care is clear and convincing evidence of appellant's participation. This evidence is also admissible to illuminate the relationship between appellant and Maria. *See Currie*, 400 N.W.2d at 361.

■ Furthermore, with respect to all of the testimony of the witnesses described herein, the trial court, in its final instruction, instructed the jury as follows:

Now, the State has introduced evidence in this case of occurrences testified to by one Sally Wisner, Laurie Butler, Nancy Ebaugh, Nancy Johnson, Kathy Hlivka, Sally Ebaugh, and Diana Nilles. As I told you at the time that this evidence was offered, it was admitted for the limited purpose of assisting you in determining whether the Defendant committed the crime with which she is charged in the complaint which I read to you.

Defendant is not being tried for and may not be convicted of any crime other than the crime charged in the complaint. You are instructed specifically that you are not to convict the Defendant on the basis of any of these occurrences. To do so might result in unjust, double punishment.

By giving this cautionary instruction, the trial court carefully guarded against undue

prejudice. *State v. Waukazo,* 374 N.W.2d 563, 565 (Minn.Ct.App.1985).

5. Appellant claims that the court erred in failing to give a jury instruction on the lesser included offense of first degree manslaughter. Appellant contends that defense counsel requested a first degree manslaughter instruction and the trial court denied the request. However, the in-chambers conference on this issue was not made part of the record, and the state disputes that the request was actually denied, contending, rather, that the request was withdrawn.

On March 5, 1987, the court held a hearing on appellant's motion to expand the record to include the fact that a request for an instruction on the lesser included offense was made. Appellant introduced an affidavit prepared by defense counsel and signed by court reporter Debra Kallevig, in which she states that she remembers a request being made. However, the prosecutor stated, "I do not remember [defense counsel] asking for misdemeanor manslaughter and the court denying that motion." The court stated:

> Well, my recollection is that on the particular morning, and I don't know if it was January 21st or January 22nd, but I do recall [defense counsel] in chambers along with [the prosecutor] and I recall that morning [defense counsel] walking in and saying quite clearly, "I want an instruction on first degree manslaughter as a lesser included offense." And then I recall, as [the prosecutor] does, a somewhat lengthy discussion on the pros and cons of that. I remember [the prosecutor] stating that if [defense counsel] was going to make that request, "I'm going to oppose it." My further recollection is that after discussion [defense counsel] either said, "I want to check with Ron," refering to Ron Meshbesher, and I don't recall the result of that. I also recall [defense counsel] saying that he, on second thought, would not request the lesser-included offense of first degree manslaughter after our discussion[.] * * * I specifically recall *not* denying [defense counsel's] request for a lesser included offense of first degree manslaughter be-

cause it's my recollection that he abandoned the request after our discussion. (Emphasis added.) The court denied the motion to expand the record to include a request for an instruction for a lesser included offense.

■ At an in-chambers conference on January 22, 1987 (which appears to be after the discussion mentioned above), the court provided both attorneys with the jury instructions, and defense counsel *did not object* to the fact that there was not an instruction on the lesser included offense of first degree manslaughter. Failure to object to the lack of submission of the lesser included offense forfeits the right to raise on appeal the claim that the lesser offense should have been submitted. *State v. Morales,* 324 N.W.2d 374, 376 (Minn. 1982); *State v. Scheerle,* 285 N.W.2d 686, 687 (Minn.1979).

■ However, even if defense counsel requested an instruction on first degree manslaughter and the court denied the request, the denial would have been proper. Minn. Stat. § 609.04 subd. 1 (1986) provides:

> Upon prosecution for a crime, the actor may be convicted of either the crime charged or an included offense, but not both.

In determining what, if any, lesser degrees should be submitted, the test is:

> whether the evidence would reasonably support a conviction of the lesser degree and at the same time is such that a finding of not guilty of the greater offense would be justified.

*State v. Leinweber,* 303 Minn. 414, 422, 228 N.W.2d 120, 125–126 (1975). The proof of the elements which differentiate the two crimes must be sufficiently in dispute so that a jury may consistently find a defendant innocent of the greater offense and guilty of the lesser offense. *State v. Adams,* 295 N.W.2d 527, 532 (Minn.1980).

Appellant was charged with second degree murder. Minn. Stat. § 609.19(2) (1986) provides:

> Whoever does the following is guilty of murder in the second degree * * *:

(2) Causes the death of a human being, without intent to effect the death of any person, while committing or attempting to commit a *felony* offense * * *.

(Emphasis added.) Minn.Stat. § 609.20(2) (1986) provides:

Whoever does any of the following is guilty of manslaughter in the first degree * * *:

(2) Causes the death of another in committing or attempting to commit a *misdemeanor or gross misdemeanor* offense with such force and violence that death of or great bodily harm to any person was reasonably foreseeable * * *.

(Emphasis added.)

The key here is the underlying offense. In this case, appellant was charged with the underlying crime of assault in the third degree, which is a felony offense.[2] First degree manslaughter is to be charged only where the underlying crime is a misdemeanor or a crime against property. *Adams*, 295 N.W.2d at 533.[3]

Where * * * the underlying felony is a crime against the person, a lesser included offense instruction is not appropriate. A jury would have no rational basis on which to acquit on the greater and at the same time convict of the lesser offense.

*Id.* Our recent decision in *State v. Larsen*, 413 N.W.2d 584 (Minn.Ct.App.1987) supports this conclusion.

In this case, if appellant is guilty at all, she is guilty of the greater offense of second degree murder because of the type of assault she perpetrated on Maria. It is undisputed that Maria's brain suffered substantial bodily harm,[4] which ultimately resulted in her death. If we assume that the jury believed the state's witnesses, then *only* a felony assault could have occurred.

Finally, appellant's entire case was based on the claim that Maria's death was an accident. The defense never suggested that if appellant had assaulted Maria she only committed a misdemeanor assault rather than a felony assault. Thus, instruction on a lesser included offense would not have been appropriate here.

6. Appellant asserts that a new trial should be granted in the interests of justice. We have carefully reviewed the record and sustain the conviction.

### DECISION

Affirmed.

CRIPPEN, J., dissents.

SCHUMACHER, J., took no part in the consideration or decision of this case.

CRIPPEN, Judge, dissenting.

The trial court permitted several witnesses to testify about appellant's relationship with her daughter Maria and appellant's interaction with other children. Because this testimony included highly prejudicial evidence tending only to assassinate the character of appellant and because the conflicting medical evidence creates an extremely close case, the erroneous evidentiary rulings require a new trial.

1. Unproven relevancy.

To be admissible, "bad acts" or "other crimes" evidence must meet three requirements: (1) the evidence must be relevant and material to the state's case; (2) the defendant's participation in the offense must be clear and convincing; and (3) the probative character of the evidence must outweigh its potential for unfair prejudice. *State v. Filippi*, 335 N.W.2d 739, 743 (Minn.1983).

---

**2.** Appellant had been indicted by a grand jury on the same offense, but the indictment was dismissed on procedural grounds. The county attorney then filed a complaint charging appellant with second degree murder.

**3.** Third degree assault occurs when a person "assaults another and inflicts substantial bodily harm." Minn.Stat. § 609.223 (1986).

**4.** Fifth degree assault, which is a misdemeanor offense, occurs when a person "intentionally inflicts or attempts to inflict bodily harm upon another." Minn.Stat. § 609.224 subd. 1(2) (1986).

The trial court admitted evidence of the child's broken arm, a black eye, and blood on the child's face and mouth. There was not, however, clear and convincing evidence that these injuries were the result of appellant's conduct.

Dr. Goldfarb testified that appellant came to his office with Maria on October 28, 1985. At that time, Dr. Goldfarb discovered a nondisplaced fracture with a break above the elbow in the lower third of the humerus. There was no testimony or record of a connection between this injury and abuse of the child by appellant.

Diana Niles testified that she saw Maria in her parent's furniture store in January or February 1986. She testified that Maria had a "black eye" on that day. She also testified that she saw that Maria had a broken arm, and that appellant "didn't really know at first how it happened." Finally, Ms. Niles testified that in May 1986 she saw Maria with blood on her face, in her mouth, and with "puffy cheeks."

This evidence is highly probative, if appellant's connection to the incidents was sufficiently proven. The record does not, however, support a finding that appellant's participation was clear and convincing. Without such a connection, this highly damaging and prejudicial evidence should not be admitted.

2. Irrelevant prior conduct.

The prosecution was also permitted to introduce evidence of several incidents showing that appellant may have dealt poorly with other children and Maria. One witness testified that appellant threw a light, sponge ball into Maria's face three times. More evidence was admitted that appellant told a witness that she had given Maria roast beef for lunch and she would not eat it, so she gave it to her for supper and she would not eat it. Appellant then allegedly gave her daughter the roast beef for breakfast and finally, lunch before Maria finally ate it. The witness describing this feeding event was permitted to speculate on whether the child had eaten other food at the time.

Witnesses described spanking and shaking incidents which were not serious. Testimony was permitted on other conduct not shown to be serious: incidents when the mother served food which appeared to be too hot; when on one of these occasions she "just sat there" when her daughter cried; and when appellant was seen dropping a meatball for a child to eat. A witness testified that when appellant put her day-care children in cribs for naps, she would lean over the crib and drop the children eight inches feet first into their cribs. Even as to appellant's conduct on two occasions in lifting her daughter by the arm, it was not shown that appellant was attempting to harm the child.

The admissibility of this evidence is based upon an assumption that these incidents are relevant to prove motive for the taking the life of the child.[1] They purport to at least show the relationship of appellant and her child. The evidence suggests parenting shortcomings, but it does not show malice and does not materially support the state's contentions of an intention to hurt or a motive to kill. Without speculation on its meaning, it is not evident that this evidence shows a bad attitude of appellant or lack of attachment to her child. This evidence of her dealings with Maria was significantly more prejudicial than probative and was not admissible.

3. Conclusion

There is acute danger of prejudicial error in permitting "bad acts" evidence. The standard of *Filippi*, tracing to the *Spriegl* decision in 1965, must be tightly applied. *See State v. Spriegl*, 272 Minn. 488, 139 N.W.2d 167 (1965). Permitting evidence of prior misconduct, even under the safeguards prescribed in these cases, is "potentially oppressive." *Id.* at 494, 139 N.W.2d at 171. Here those safeguards were not employed, and it is abundantly evident that a difficult jury decision may have turned

1. More probative evidence, certainly admissible, included a physician's characterization of appellant's attachment to the child. This testimony and similar descriptions of appellant's attitude to the child should be distinguished from incidents not shown to manifest nonattachment.

ultimately on irrelevant evidence tending only to assassinate appellant's character.

The errors in this case might not be reversible in some cases, but they constitute reversible error here. Although I agree that the conflict in evidence of the experts alone is not such to raise grave doubts on the sufficiency of the state's evidence to support a guilty verdict, the evidentiary errors were likely determinative in an otherwise close case. We should reverse and remand for a new trial.